Steven Wieland, ISB No. 8282
Jaren Wieland, ISB No. 8265
MOONEY WIELAND WARREN
512 W. Idaho St., Ste 103
Boise, ID 83702
t: 208.401.9219
f: 208.401.9218
steven.wieland.service@mooneywieland.com
jaren.wieland.service@mooneywieland.com

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **Zach Porter Investments, LLC**, an Idaho limited liability company,<br><br>              Plaintiffs,<br><br>vs.<br><br>**Reiss Technology Corp.**, a New Jersey corporation; **Paul Reiss**, an individual resident of New Jersey; **Joseph Fanelli**, an individual resident of California; **Dave Roth**, an individual resident of New Jersey; and **Rosenberg Rich Baker Berman, P.A.**, a New Jersey professional corporation,<br><br>              Defendants. | Case No.<br><br>**Complaint**<br>*Jury Trial Demanded* |

Plaintiff Zach Porter Investments, LLC, by and through its undersigned counsel, MOONEY WIELAND WARREN, for its Complaint against Defendants, alleges as follows:

## INTRODUCTION

1.     Zach Porter Investments, LLC ("**Porter Investments**"), a purchaser of a majority interest in a luxury sport fishing business, seeks to recover its investment from the seller and its principal, plus damages, under claims for securities fraud and breach of warranty.

2.      Porter Investments seeks at least $1,526,500 in damages plus court costs and attorney fees.

## PARTIES

3.      Plaintiff Zach Porter Investments is an Idaho limited liability company with a principal place of business in Meridian, Idaho. Plaintiff has a single member: Zachery Porter, an individual and citizen of Idaho. Porter Investments purchased an interest in Acute Angling LLC, a Delaware company ("**Acute Angling**").

4.      Defendant Reiss Technology Corp. ("**RTC**") is a New Jersey corporation with a principal place of business in Califon, New Jersey. It formerly owned and operated the Acute Angling business under an assumed business name.

5.      Defendant Paul Reiss is an individual residing in Califon, New Jersey. He is the sole shareholder, director, and officer of RTC and has been so at all times relevant.

6.      Defendant Joseph Fanelli is an individual residing in West Sacramento, California. He served as the business broker for Porter Investments' s purchase of equity in Acute Angling.

7.      Defendant Rosenberg Rich Baker Berman, P.A. d/b/a RRBB ("**RRBB**") is a New Jersey Professional Corporation with a principal place of business in Somerset, New Jersey.

8.      Defendant Dave Roth is a New Jersey resident. He is a licensed CPA and is the managing partner and CEO of RRBB. Collectively, Defendants RRBB and Dave Roth are ("**Roth**").

## VENUE AND JURISDICTION

9.      This Court has diversity subject-matter jurisdiction under 28 U.S.C. §

1332(a)(1) because this is a civil action between Plaintiff, an Idaho company, and Defendants, who are New Jersey and California residents.

10.     Venue is proper in this court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Idaho.

11.     Defendants are subject to personal jurisdiction in this Court because they transacted business in this state and undertook tortious activities in this state.

## GENERAL ALLEGATIONS

### A.     Pre-Closing Representations

12.     Prior to December 2021, RTC offered luxury sportfishing excursions in the Amazon River basin under the assumed name Acute Angling (the "**Business**"). At its core, the Business is a marketing enterprise. It solicits refundable deposits and prepayments for fishing trips from tourists, then uses most of the money to pay its two independent contractors in Brazil to fulfill the trips. Brazil is in the southern hemisphere, so its fishing season runs from September through mid-March.

13.     Starting in May 2021, Porter and Reiss engaged in extensive discussions around Porter buying a majority interest in the Business. Discussions progressed to formal negotiations and due diligence in late 2021.

14.     Fanelli solicited Porter's investment in the Business, participated in the initial discussions with Porter, represented Reiss in negotiations, and facilitated due diligence, all in the role of a business broker.

15.     Over the course of 2021, Reiss, Fanelli, and Roth represented that RTC was profitable and was solvent. These representations and omissions included, but are not limited to, the following (collectively the "**Financial Representations**"):

a.      On May 29, 2021, Fanelli sent to Porter a letter written by a valuation consultant named Patrick Tabor of Swan Mountain Consulting Group . The letter, which was dated August 10, 2018, indicated that the Business's EBITDA was $528k. Fanelli's email described Mr. Tabor as "one of the top American Outdoor Association financial consultants" who "has been involved in over 300 deals in the past 16 years." Fanelli stated that Mr. Tabor helped RTC "perform a comprehensive analysis of our business" prior to drafting the letter.

b.      On June 15, 2021, then again on July 5, 2021, Fanelli sent an email with an Excel spreadsheet attached entitled "Management projections – F season." That document projected 2021-2022 season net income of $361k.

c.      On July 14, 2021, Fanelli sent an email to Porter and others in which he stated that, based on management's projections, the company could "commit to a minimum net profit" of $362k, $425k, and $525k in the three fishing seasons starting with 2021-2022.

d.      On July 14, 2021, Reiss responded to an email from Porter in which Porter questioned the veracity of RTC's past finances and projections. Reiss wrote that the company had an approximate net profit margin of 26%. He also wrote, "I'm committed to total transparency. We have a great business with nothing to hide."

e.      On August 6, 2021, Fanelli sent an "Official 2019 Business Prospectus" (the "**2019 Prospectus**") to Porter. The 2019 Prospectus showed EBITDA for the years 2015–2019 to be over $336k, $384k, $427k, $527k, and $622k, respectively. The 2019 Prospectus claimed net income for that period to range from $279k to $618k. It also

stated that RTC had engaged a third-party consulting group "to consult on business and financial information."

f.    In the same August 6, 2021 email, Fanelli also sent an Excel spreadsheet called "financial statements 6-19-19" to Porter stating that the Business's net income for the years ending March 31 of 2016–2019 was over $317k, $279k, $392k, and $618k, respectively. The spreadsheet showed positive year-end shareholder equity of over $50k, $311k, $704k, and $665k for the same years. It projected over $794k in net income and $731k in shareholder equity for the year ending March 31, 2020. The balance sheet showed over $559k in cash and $1.7 million in accounts receivable as of March 31, 2019.

g.    Also attached to the August 6, 2021, email was a PDF spreadsheet called "financial statements 11-27-2020" stating that the Business's net income for the years ending March 31 of 2017–2020 was over $279k, $491k, $411k, and $346k, respectively, with positive shareholder equity of $311k, $802k, $556k, and $652k for the same period. It projected over $497k in net income and $662k in equity for the year ending March 31, 2022. The balance sheet showed over $89k in cash and $1.5 million in accounts receivable as of March 31, 2020.

h.    Paul Reiss's brother, **Garry Reiss**, kept the books for the Business for many years prior to closing and continued to do so until March 2023. In late 2021, Porter personally met with Roth and Garry Reiss at the home of Reiss's brother in Teetertown, New Jersey. At that meeting, Roth by words and conduct indicated that the financials Porter had received were accurate, that the company was historically

profitable, and that it had a positive balance sheet with enough cash and current receivables to cover current and near-term expenses (*i.e.* was solvent). Roth stated that when people are looking at purchasing a company, they should review the company's earnings. Roth then showed historical earnings to Porter. Roth did not warn Porter that the earnings he was displaying to Porter were materially inaccurate.

16.     Taken both individually and collectively, the Financial Representations caused Porter to believe that the Business was: (a) historically profitable; and (b) solvent. The Financial Representations also omitted disclosure of the amount of customer deposits received, the liability associated the customer deposits, and approximately $131,000 in credit card debt.

17.     All of the above representations were materially false when made. Prior to December 2021 (when Porter purchased his interest in the Business), RTC was not profitable. Starting no later than when the above representations were made, and continuing through today, RTC was and is insolvent with no reasonable prospect of rehabilitation.

18.     Over the course of 2021, Reiss, both directly and through RTC's agents, made other representations and omissions regarding the Business's condition (collectively the "**Non-Financial Representations**"). These Non-Financial Representations included the following. The 2019 Prospectus stated that the Business's trips in indigenous territories were fully approved by the Brazilian government's National Indigenous People Foundation ("**FUNAI**"), the agency that regulates agreements with indigenous groups to fish in their river systems.

19.     In reality, the company's trips on the Mapuera River, an Amazon River tributary, were not properly permitted and the preliminary work to obtain permits was incomplete (according to the Brazilian government).

20.     Together, the Financial Representations and the Non-Financial Representations are the "**Material Representations**."

**B.     Closing of the Purchase of Securities**

21.     As part of the transaction at issue in this lawsuit, on December 10, 2021, RTC transferred all or most of the assets of the Business to Acute Angling. These assets included "accounts receivable and work in progress."

22.     That same day, Plaintiff entered into that certain Membership Interest Purchase Agreement (the "**Purchase Agreement**") with RTC and Reiss under which Plaintiff agreed to purchase 60% of the units in Acute Angling from RTC for $1.2 million (the "**Securities**"). A true and correct copy of the Purchase Agreement is attached as **Exhibit A**.

23.     The sale of the Securities closed on December 10, 2021.

24.     Under the Purchase Agreement, $1.2 million was characterized as the "purchase price" for tax purposes. Of that amount, $1,106,000.00 was wired directly to Reiss's personal account at Bank of America. Most of the rest was paid as a $66,500 commission to Fanelli. A true and correct copy of the Funds Flow for closing is attached as **Exhibit B**.

25.     In addition to the $1.2 million, Porter Investments paid Reiss $19,500 to offset purported tax inefficiencies that arose by structuring the deal as an asset transfer followed by an equity sale. (Ex. A § 7.13.)

**C.     Ownership and Management of Acute Angling**

26.     Upon obtaining the Securities, Porter Investments became 60% owner of Acute Angling and RTC became 40% owner.

27.     Effective December 10, 2021, Acute Angling, RTC, and Porter Investments entered into an operating agreement entitled First Amended & Restated Limited Liability

Company Agreement.

28.    Effective March 15, 2022, Brent Moreland, a non-party, purchased a 10% interest from RTC. Acute Angling, RTC, Porter Investments, and a company owned by Moreland entered into a new operating agreement entitled Second Amended & Restated Limited Liability Company Agreement.

**D.    Post-Closing Discovery of Misrepresentations**

29.    From closing until March 1, 2023, Reiss remained in control of Acute Angling's operations as its president.

30.    When it appeared throughout 2022 that a legal dispute was developing between RTC and Porter Investments, Reiss only strengthened his grip on the Company's affairs and avoided taking any action to turn over meaningful control to Porter Investments.

31.    After closing, Porter Investments began to uncover pervasive accounting irregularities with the Business. These include, but are not limited to the following:

a.    When a customer booked a trip, RTC recorded the entire anticipated fee to be paid by the customer in the future as an account receivable even though the money had not been earned. This caused the balance sheet to dramatically overstate current assets.

b.    When the Business received a deposit or prepayment from a customer, RTC recognized the money as earned revenue even though the fishing trip had not been fulfilled and associated expenses had not yet been paid. This meant that net earnings were dramatically overstated because most of each prepayment must be spent to fund the costs of fulfilling the customer's trip.

32.    Based on a preliminary investigation, the Business's books overstated the

company's aggregate earnings as of the closing date by approximately $1.2 million.

33.     As of closing, the books also overstated accounts receivable by hundreds of thousands of dollars. Large portions, if not all, of the accounts receivables were not bona fide receivables because the services had not been provided and the customers continued to have options to cancel and obtain refunds.

34.     As a result of these accounting problems, Acute Angling was using unearned deposits from trip bookings to cover overhead and the expenses of other customers' trips. Those customer deposits were refundable and therefore should have been recognized as a liability but no such liability was recorded. Acute Angling therefore was and is insolvent.

35.     When confronted with these irregularities, Reiss, Fanelli, and Roth, all denied that the Business's deposits and receivables were mischaracterized.

36.     Fanelli and Reiss continue to urge Porter to use new customer deposits to pay for other customers' trips.

**E.      RTC, Reiss, and Fanelli Attempt to Defraud Another Buyer**

37.     Realizing that Porter Investments was exploring legal action against him, Reiss attempted to find a third party to purchase the company. A prospective buyer underwent due diligence to purchase those units, but Reiss and RTC concealed from the prospective buyer that Acute Angling is insolvent. Reiss and RTC also refused to warrant the accuracy of the company's books to the prospective buyer with respect to the Securities.

38.     Porter Investments could not warrant to the prospective buyer that the finances the buyer received from RTC and Reiss were accurate for the reasons stated above.

39.     The prospective buyer declined to purchase Acute Angling. RTC, Reiss, and Fanelli are using the prospective buyer's decision as further pretext for refusing to compensate

Porter Investments for its lost investment as part of their scheme to defraud.

**F.    Post-Closing Misconduct by Defendant Reiss**

40.    From the closing on December 10, 2021, until March 1, 2023, Reiss remained in control of Acute Angling as its president.

41.    Before closing, Reiss told Porter that he was forgiving "personal debt" owed to him by the two Brazilian contractors that fulfilled trips for Acute Angling. Reiss then informed those contractors that a total of over $187k in combined debt was forgiven. Porter later discovered that the debt was not owed to Reiss personally but to the company. Porter would not have assented to the forgiveness if he had known that fact.

42.    Shortly after closing, Reiss used Acute Angling funds to pay off approximately $131k in credit card debt for pre-closing Business expenses without Porter's assent. This debt had not been disclosed to Porter Investments prior to closing.

43.    Roughly half of Acute Angling's trip offerings were on waterways within indigenous areas in Brazil. Some of these trips were fulfilled by one of Acute Angling's two fulfilment contractors, Wellington de Araujo Melo ("**Wellington**").

44.    Unbeknownst to Porter, Wellington lacked the approval it needed from FUNAI to operate trips in certain indigenous areas. Operating unpermitted trips is a crime under Brazilian law. Reiss was aware of all this prior to closing.

45.    Prior to closing, Wellington and Reiss ran trips on the Mapuera River, a tributary of the Amazon. These trips may have been conducted without sufficient government approvals. In September 2022, the Brazilian government instituted enforcement actions against Wellington d/b/a Acute Angling, seeking 3,000,000 Brazilian reals ($600,000 USD) in penalties. Reiss never warned Porter Investments about this potentially liability. Reiss falsely

told Porter that this action had been dismissed when in fact it is ongoing.

46.     In December 2022, Reiss directed Wellington to enter an agreement with the Brazilian government under which Acute Angling became bound to pay a penalty of 600,000 Brazilian reals (or about $120,000 USD) to finish its trips for the 2022–2023 season (the "**Conduct Adjustment Agreement**"). The Conduct Adjustment Agreement also required Acute Angling to forfeit one of its four facilities in Brazil, a fishing lodge at village called Pica-Pau on the Jatapu River, along with thousands of dollars in gear, boats, motors, furnishings, and other company property (collectively the "**Multi-Species Lodge**"). Reiss did all of this without first informing Porter Investments or obtaining its consent. Reiss also took no steps to provide for the monetary penalty or to find an alternative facility through which to run future trips in the area.

47.     In March 2023, Acute Angling learned that it and Reiss are potentially under criminal investigation by the Brazilian federal government for running allegedly unpermitted trips in indigenous areas. This is forcing Acute Angling to incur legal fees in Brazil to defend against a possible criminal prosecution.

48.     On March 11, 2023, the Brazilian government sent a notice to Reiss (as agent of Acute Angling) not to operate further trips on the Curicuriari River, which runs through another indigenous area. At no point did Reiss warn Porter that the company would lose its right to run those trips.

49.     Due to the Brazilian government's enforcement efforts, Acute Angling is no longer able to operate trips through Wellington, costing it significant  anticipated revenue in the 2023–2024 season. It will also be forced to cancel or rebook trips for which it already has

bookings.

50.    All of the foregoing legal issues have irretrievably damaged Acute Angling's reputation in the sportfishing community and with the public agencies in Brazil.

**G.    The Company Remains Insolvent**

51.    As of March 15, 2023, just two weeks after Reiss resigned as president, the company had a balance sheet of negative $1.24 million.

52.    The company has no cash. The company cannot take additional deposits or prepayments from new customers and in turn use those funds to cover trips reserved by other customers. Doing so would amount to a lapping scheme whereby prior customer deposits that should be on hand and are now missing are covered by new customers. This cycle simply would perpetuate a fraud on new customers.

**COUNT I**
**BREACH OF CONTRACT**
**(Porter Investments v. RTC)**

53.    Plaintiffs incorporate all the allegations above as if fully restated herein.

54.    The Purchase Agreement is an enforceable contract between RTC and Porter Investments.

55.    In Section 2 of the Purchase Agreement, RTC made warranties and representations not conditioned on any person's actual or constructive knowledge or on any investigation or lack thereof by any party. The warranties and representations pertained to the condition of the company on the closing date, December 10, 2021, and included (but are not limited to) the following.

56.    *Finances.*

a.    RTC warranted that it had given financial statements to Porter

Investments and that each of them "is complete and correct in all material respects, is consistent with the books and records of the company (which, in turn, are accurate and complete in all material respects) and fairly presents the Company's financial condition, assets and liabilities . . . and cash flows." (Ex. A § 2.6.)

b.      In fact, the financial statements RTC provided to Porter Investments overstated accounts receivable by approximately $1.5 million, failed to properly state the liabilities, showed a positive balance sheet when the company was insolvent, significantly overstated cash on hand, and represented the company as being profitable between 2017 and 2021 when in fact it was not.

57.     *Undisclosed Liabilities.*

a.      RTC warranted that it had disclosed its liabilities to Porter Investments and that "the Company does not and the Company, with respect to the Business does not, have any debts, liabilities or obligations of any nature (whether accrued, absolute, contingent, direct, indirect, perfected, inchoate, unliquidated or otherwise and whether due or to become due) arising out of transactions entered into at or prior to the Closing." (Ex. A § 2.7)

b.      In reality, RTC's disclosures omitted the following: (i) the accounts receivable did not represent amounts owed for services delivered but instead represented cancellable and refundable bookings for which the company would still need to fulfill booked trips; (ii) RTC did not disclose the fines and forfeitures that would become due to the Brazilian government for operating unpermitted fishing trips; and (iii) RTC did not book a liability reflecting the fact that a significant amount

of its cash on hand, and cash already spent, consisted of customer deposits for which

the company had not earned the funds and did not have the right to spend the funds.

58.     *Compliance with Laws.*

      a.    RTC warranted that Acute Angling was "duly licensed or qualified to

do business and is in good standing in each jurisdiction in which the properties owned

or leased by it" (Ex. A § 2.2).

      b.    RTC warranted that the company "is in material compliance with all

Laws applicable to it or its business, properties or assets." It further warranted that

"[a]ll permits required for Company to conduct its business have been obtained by it

and are valid and in full force and effect in all material respects." (*Id.* § 2.14.)

      c.    In reality, RTC did not disclose the imminent legal problems described

above that the company was facing with the Brazilian government.

59.     *Material Adverse Effect.* RTC warranted against the occurrence of any "Material

Adverse Effect," defined as any event or condition materially adverse to the Business, its

financial condition, or assets. (Ex. A § 2.8(a) and pg. 25.) Similarly, RTC also warranted that

"[t]here are no facts that have not been disclosed to Buyer which materially adversely affect or

could materially adversely affect the Business." (*Id.* § 2.20.) RTC is in breach of this warranty.

60.     *Misrepresentation.* RTC warranted that none of the documents, exhibits, or

other instruments it had delivered "contain any untrue statement of a material fact or omit to

state a material fact necessary to make the statements contained herein or therein not

misleading." (Ex. A § 2.20.) RTC is in breach of this warranty.

61.     The warranties in the Purchase Agreement are in force for eighteen months

from the closing date on December 10, 2021. (Ex. A § 6.1.)

62.     As a remedy for any inaccuracy or breach of the aforesaid warranties, RTC agreed to indemnify Porter Investments against its losses. (Ex. A § 6.2.)

63.     Porter Investments has suffered losses equal at least to $1,219,500.00.

## COUNT II
## SECURITIES FRAUD UNDER THE IDAHO UNIFORM SECURITIES ACT
### (Porter Investments v. RTC, Reiss, and Fanelli)

64.     Plaintiffs incorporate all the allegations above as if fully restated herein.

65.     Jurisdiction over the Securities purchase exists under Idaho law pursuant to I.C. § 30-14-610 because the offer to sell and the sale of the Securities were made and accepted in this state.

66.     The Securities are "securities" as defined in the Idaho Uniform Securities Act because they are an interest in a limited liability company. I.C. § 30-14-102(28)(e).

67.     Reiss and his solely-owned company, RTC, were aware that the Material Representations being made to Porter Investments were materially false because Reiss personally built and ran the company as its president for over twenty-five years and his brother was a bookkeeper.

68.     Fanelli was also aware that the representations were false in his role as an unlicensed broker for the Securities transaction, a promoter of the Business and its services, and long-time personal friend of Reiss.

69.     Reiss and Fanelli knew that they and Roth were Porter Investments' only source of information and Porter Investments was relying on that information in deciding whether to purchase the Securities.

70.     For the same reason, Porter Investments was not aware of the falsity of the

Material Representations.

71.     The Material Representations were material to Porter Investments in deciding to invest. If Porter Investments was aware that the Business was insolvent, unsustainable, had a negative balance sheet, and/or faced legal difficulties relating to roughly half of its trips in Brazil, then Porter Investments would not have bought the Securities.

72.     In addition to direct liability, Fanelli is jointly and severally liable with RTC and Reiss as a person associated with them who materially aided the fraudulent conduct under I.C. § 30-14-509(g).

73.     Pursuant to I.C. § 30-14-509(b), Porter Investments is entitled to recover the consideration paid for the Securities in the amount of $1,219,500.00 plus prejudgment interest under I.C. § 28-22-104(2).

## COUNT III
## NEGLIGENT MISREPRESENTATION
### (Porter Investments v. Fanelli and Roth)

74.     Plaintiffs incorporate all the allegations above as if fully restated herein.

**A.     Against Fanelli**

75.     Fanelli acted as a business broker during the transaction.

76.     Porter Investments relied on the information that Fanelli sent directly to him by email and on information communicated verbally.

77.     Fanelli knew that Porter Investments was relying on his representations because they were made directly to Porter for the purpose of inducing him to invest in the Business through Porter Investments.

78.     Fanelli lacked a reasonable basis for the Material Representations he made to Porter Investments. It was negligent of him to make them.

79.     As a direct result of Fanelli's negligence, Porter Investments lost $1,219,500.00 in investment principal, plus other damages in an amount to be proven at trial.

**B.      Against Roth**

80.     Roth is, and at all times relevant was, a licensed CPA.

81.     He knew that the Material Representations he made and other information provided was being provided in relation to the sale of the Securities to Porter Investments.

82.     He provided Material Representations and other information directly to Porter, including in an in-person meeting in New Jersey.

83.     Roth expressly indicated that he knew Porter Investments would be relying on his information.

84.     Roth lacked a reasonable basis for the Material Representations he made to Porter Investments. It was negligent for him to make them.

85.     As a direct result of Roth's negligence, Porter Investments lost $1,219,500.00 in investment principal, plus other damages in an amount to be proven at trial.

**COUNT IV**
**COMMON-LAW FRAUD**
**(Porter Investments v. RTC, Reiss, and Fanelli)**

86.     Plaintiffs incorporate all the allegations above as if fully restated herein.

87.     For the previously stated reasons, RTC, Reiss, and Fanelli made certain of the Material Representations directly to Porter Investments; those investments were false; RTC, Reiss, and Fanelli knew they were false when made; they made the statements knowing that they were being relied upon by Porter Investments; Porter Investments did not know the assertions were false; and Porter Investments justifiably relied upon them in deciding to enter a transaction relating to the sale of Securities.

88.    As a direct result of the above-described fraud, Porter Investments lost $1,219,500.00 in investment principal plus other damages in an amount to be proven at trial.

## COUNT V
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (Porter Investments v. RTC and Reiss)

89.    Plaintiffs incorporate all the allegations above as if fully restated herein.

90.    At all times relevant, RTC and Porter Investments have been members of Acute Angling.

91.    RTC, Reiss, and Porter Investments have contractual relationships arising from the sale of the Securities, including the Purchase Agreement.

92.    The loan forgiveness described in Paragraph 41, the credit card payment described in Paragraph 42, and the asset forfeitures resulting from the Conduct Adjustment Agreement described in Paragraph 46, all singly and collectively prevent Porter Investments from enjoying the benefit of the contractual relationships with Acute Angling, Reiss, and RTC by depriving the company of assets in a bad faith effort to conceal fraud and transfer company assets to Reiss's friends.

93.    RTC is therefore liable for its breach of the implied covenant of good faith and fair dealing in at least the amount of $307,000.

## COUNT VI
## PIERCING THE CORPORATE VEIL / ALTER-EGO
### (Porter Investments v. Reiss)

94.    Plaintiffs incorporate all the allegations above as if fully restated herein.

95.    Reiss is and has always been the sole shareholder, officer, and director of RTC. He dominates the company.

96.    Reiss intermingles his personal finances with RTC's. For example, the

purchase price for the Securities was mostly wired directly to Reiss's personal bank account.

97. Reiss intentionally has undercapitalized RTC. The company has extensive liabilities as described in this Complaint, including without limitation warranty and indemnification obligations in the Purchase Agreement. Reiss has bled out all the assets of RTC to prevent it from being able to meet those obligations.

98. Reiss induced Porter Investments to enter into the various transactions above with RTC knowing that RTC would never be able to meet its financial obligations.

99. Reiss's actions have the effect of working a fraud upon Porter Investments. It would be unjust for Reiss to escape personal liability by using his company as an alter-ego to inequitably shield himself.

100. Reiss is therefore personally liable to Porter Investments for the full amounts established on their claims against RTC in the amount of at least $1,526,500.00, plus pre- and post-judgment interest.

## ATTORNEY FEES AND COURT COSTS

101. Due to Defendants' wrongful conduct, Plaintiffs have been required to retain MOONEY WIELAND WARREN in this action.

102. Porter Investments is entitled to recover attorney fees pursuant to the terms of the Purchase Agreement and the Operating Agreement.

103. Porter Investments is entitled to recover attorney fees pursuant to applicable statute, including without limitation I.C. §§ 30-14-509(b), 12-120(3), and 12-121.

104. In the event of a default judgment against any Defendant, a reasonable attorney fee will be $40,000.00.

## JURY TRIAL

105.    Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a jury trial on all issues so triable.

## PRAYER

**Wherefore**, Plaintiffs request a judgment in their favor and against Defendants as follows:

A.    An award of damages in favor of Porter Investments and against all Defendants jointly and severally in the amount of at least $1,526,500, plus other damages in an amount to be proven at trial;

B.    An award of court costs in favor of Plaintiffs and against Defendants jointly and severally;

C.    An award of attorney fees in favor of Plaintiffs and against Defendants jointly and severally, which in the event of a default by any Defendant will be at least $40,000;

D.    Any other or further relief deemed appropriate by the Court.

Dated May 12, 2023

Steve Wieland, ISB No. 8282
MOONEY WIELAND WARREN
512 W. Idaho St., Ste 103
Boise, ID 83702
t: 208.401.9219
f: 208.401.9218
steven.wieland.service@mooneywieland.com
*Counsel for Plaintiff*

DocuSign Envelope ID: A9D6D84D-8F4D-474E-A7D2-16B8FE7673A9

MS Draft 12-10-21

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), dated and effective as of December 10, 2021 ("**Effective Date**"), is entered into between Reiss Technology Corp., a New Jersey corporation (the "**Seller**" or the "**Company**"), Paul Reiss, an individual residing in New Jersey (the "**Owner**") and Zach Porter Investments, LLC, an Idaho limited liability company (the "**Buyer**"). Capitalized terms not otherwise defined in this Agreement have the meanings set forth in Exhibit A.

### RECITALS

A.    Seller owns all of the issued and outstanding membership interests of Acute Angling, LLC, a Delaware limited liability company (the "**LLC**"). The Company operates, in partnership with various Brazilian based business affiliates and partnerships, to offer a high-end all-inclusive fishing expedition business to international customers ("**Business**").

B.    On or about December 10, 2021 (the "**Contribution Date**"), the Company, whose sole shareholder is Owner, contributed substantially all of its tangible and intangible assets to the LLC pursuant to a certain Contribution Agreement dated as of the Contribution Date.

C.    Seller wishes to sell to Buyer and Buyer wishes to purchase from Seller one million two hundred thousand (1,200,000) units (the "**Units**"), all of which are uncertificated but which collectively represent sixty percent (60%) of the issued and outstanding membership interests of the LLC, subject to the terms and conditions set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Purchase and Sale of Units.**

1.1    **Purchase and Sale**. Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Units for the consideration specified in Section 1.2.

1.2    **Purchase Price; Growth Earnout**. The aggregate purchase price for the Units shall be **ONE MILLION TWO HUNDRED THOUSAND DOLLARS (**US$1,200,000) (the "**Purchase Price**") *plus* the growth earnout outlined in this Section 1.2, if earned. Seller acknowledges that Buyer has previously paid $10,000 as a deposit towards the Purchase Price. Seller is and shall be eligible to receive up to four (4) additional payments following the Closing Date in accordance with the terms of this Section 1.2.

(a)    For purposes of this Agreement, the following terms shall have the meaning set forth below:

"**Measurement Period**" means the period commencing April 1st and concluding on March 31st of each of the 2022-2023, 2023-2024, 2024-2025 and 2025-2026 fishing seasons. Each of the foregoing is a Measurement Period for purposes of calculating the appropriate earnout associated with such fishing season.

EXHIBIT A

"**Target Revenue**" means $3,000,000 and reflects the LLC gross revenues (less customer refunds) related to the Business.

(b)     Within 90 days following the end of each Measurement Period (each, the "**Calculation Period**"), Buyer shall calculate the gross revenues (less customer refunds) of the Business achieved during the relevant Measurement Period (the "**Actual Revenue Amount**"). To the extent the Actual Revenue Amount is greater than Target Revenue (such excess, the "**Excess Revenue Amount**"), Buyer shall make a payment to Seller in an amount (the "**Earnout**") equal to eight and three/fourths percent (8.75%) underlined by the Excess Revenue Amount. As an example only, in the event that the Actual Revenue Amount during a Measurement Period is equal to $4,000,000, the Earnout payment associated with such Measurement Period would equal $87,500 (($4,000,000 - $3,000,000) x 8.75%)).

(c)     Prior to the end of the Calculation Period, Buyer shall prepare and deliver to the Seller a written statement (the "**Earnout Statement**") setting forth in reasonable detail its good faith determination of the Actual Revenue Amount.  Buyer shall provide the Seller with such records and work papers used or created to support the calculation of the Actual Revenue Amount, the Excess Revenue Amount (if any), and the Earnout (if any) (the "**Calculation Backup**"). Seller may, at Seller's cost, cause Seller's legal and accounting advisors to review the Calculation Backup and verify the accuracy of the Earnout Statement within 30 days of receipt thereof. In the event that Seller does not agree with the Earnout Statement, Seller may object thereto by delivering a written notice of objection (an "**Objection Notice**") to Buyer within such 30-day period. Any Objection Notice shall specify the items in the Actual Revenue Amount disputed by Seller and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. If Seller fails to deliver an Objection Notice to Buyer prior to the expiration of the 30-day period, the Earnout Statement and the resulting Earnout payment (if any) set forth by Buyer shall be final and binding on the parties hereto. If Seller timely delivers an Objection Notice, Buyer and Seller shall negotiate in good faith for 30 days to resolve the disputed items.  If Buyer and Seller are unable to reach an accord during such negotiation period, thereafter they shall submit the disputed items to an Independent Accountant mutually selected in good faith by the parties for resolution, and shall equally share the expenses associated with such review. The findings of such independent accounting firm shall be binding on Buyer and Seller.

(d)     If Seller is entitled to an Earnout, such Earnout shall be paid within ten (10) business days following the determination thereof pursuant to Section 1.2(c) above by wire transfer to an account identified in writing by Seller.

(e)     The right of Seller to receive any portion of the Earnout (i) is solely a contractual right and is not a security for purposes of any federal or state securities laws (and shall confer upon Seller only the rights of a general unsecured creditor under applicable state law), and (ii) will not be represented by any form of certificate or additional instrument, (iii) does not give Seller any dividend or distribution rights, voting rights, liquidation rights, preemptive rights or other rights, all of which, to the extent given, shall be as outlined in that certain LLC Agreement of even date herewith entered into by Buyer and Seller, (iv) is not redeemable and (v) may not be sold, assigned, pledged, gifted, conveyed, transferred or otherwise disposed of (a "**Transfer**"); however, for the

-2-

EXHIBIT A

sake of clarity, if Seller dies prior to the payment of an Earnout, Seller's estate or the legal representative thereof shall have the right to collect such Earnouts for all Measurement Periods as if Seller had not died. Nothing in this Agreement creates a fiduciary duty on the part of Buyer to Seller in respect of the Earnout.

(f)     Any payment made pursuant to this Section shall be treated as part of the Purchase Price.

(g)     Subsequent to the Closing Date and continuing until April 1, 2026, Buyer shall: (i) use commercially reasonable efforts to operate the Business in good faith in a manner reasonably consistent with how the Seller operated the Business prior to Closing; (ii) obtain and maintain all permits and licenses necessary to operate the Business reasonably consistent with past practices; (iii) not make any changes to the Business that would clearly and materially affect the Seller's ability to earn the Earnout set forth in this <u>Section 1.2</u>; (iv) maintain books, records and financial statements to be calculated and reviewed in accordance with this Agreement; and (v) not divert any revenues from the Business to any affiliate or division of Buyer. This <u>Section 1.2</u> shall survive Closing.

1.3     **Deliverables**

(a)     At the Closing, Buyer shall deliver to Seller:

(i)     the Purchase Price (as defined below) by wire transfer of immediately available funds to an account designated by Seller in the Funds Flow;

(ii)     an executed counterpart to that certain Software Assignment Agreement of even date herewith ("**Software Assignment Agreement**");

(iii)     an executed counterpart to that certain Amended & Restated LLC Agreement of even date herewith for the Company ("**LLC Agreement**");

(iv)     an executed counterpart to that certain Funds Flow between Buyer and Seller of even date herewith ("**Funds Flow**");

(v)     an Assignment and Assumption of Membership Interests Agreement (the "**Assignment and Assumption Agreement**"), duly executed by Buyer;

(vi)     a Royalty Agreement from Buyer in favor of Owner and Helen Reiss (the "**Royalty Agreement**"), executed by Buyer;

(vii)     a Software License Agreement between Buyer and the Company (the "**Software License Agreement**"), executed by Buyer; and

(viii) all other agreements, documents, instruments or certificates required to be delivered by Buyer at or prior to the Closing under this Agreement.

(b)     At the Closing, Seller shall deliver to Buyer:

(i)     the Assignment and Assumption Agreement, duly executed by Seller;

(ii)     an executed counterpart to the Software Assignment Agreement signed by all parties thereto;

(iii)     an executed counterpart to the LLC Agreement;

EXHIBIT A

(iv)    an executed counterpart to the Funds Flow;

(v)    a FIRTPA certificate;

(vi)    the Software License Agreement, signed by the Company;

(vii)    the Royalty Agreement, signed by Owner and Helen Reiss; and

(vi)    all other agreements, documents, instruments or certificates required to be delivered by Seller at or prior to the Closing under this Agreement.

1.4    **Closing**.  Subject to the terms and conditions of this Agreement, the purchase and sale of the Units contemplated hereby shall take place via a remote closing (the "**Closing**") on the Effective Date, or at such other time or on such other date or at such other place as Seller and Buyer may mutually agree upon in writing (the day on which the Closing takes place being the "**Closing Date**").

2.    **Representations and Warranties of Seller**.  Except as set forth in the Disclosure Schedules, Seller represents and warrants to Buyer that the statements contained in this <u>Section 2</u> are true and correct as of the date hereof.

2.1    **Authority of Seller**.  Seller has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  The execution and delivery by Seller of this Agreement, the performance by Seller of its obligations hereunder and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Seller.  This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

2.2    **Organization, Authority and Qualification of Company and LLC**.  Company is a corporation organized, validly existing and in good standing under the Laws of the State of New Jersey and, as of the Contribution Date, had all necessary corporate power and authority to own, operate or lease the properties and assets owned, operated or leased by it and to carry on its business as it had been conducted as of the Contribution Date.  As of the Contribution Date, the Company was duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business made such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not have had a Material Adverse Effect.  LLC is a limited liability company validly existing and in good standing under the Laws of the State of Delaware and has all necessary limited liability power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its Business as it is currently conducted.  LLC is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its Business as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not have a Material Adverse Effect.

2.3    **Capitalization**

(a)    The outstanding membership units of the LLC consists of two million uncertificated units, all of which are issued and outstanding and, prior to the Closing Date, are

**EXHIBIT A**

owned by Seller. All such units have been duly authorized, are validly issued, fully paid and non-assessable, and are owned of record and beneficially by Seller, free and clear of all Encumbrances.

(b)     There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the membership interests of Company or obligating Seller or Company to issue or sell any units, or any other interest in, the Company.

2.4     **No Subsidiaries**.  Company does not own or have any ownership interest in any other Person.

2.5     **No Conflicts; Consents**.  Subject to the Brazil Exception, the execution, delivery and performance by Seller of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) result in a violation or breach of any provision of the certificate of formation or operating agreement of the LLC; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller or Company; or (c) except as set forth on **Schedule 2.5** attached hereto (the "**Consent Rights**"). require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any Material Contract.  No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller or Company in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

2.6     **Financial Statements**.  Copies of Company's unaudited financial statements consisting of the balance sheet of Company and the related statements of income and retained earnings, shareholders' equity and cash flow for the year then ended (the "**Financial Statements**") have been made available to Buyer. Each of the Financial Statements is complete and correct in all material respects, is consistent with the books and records of the Company (which, in turn, are accurate and complete in all material respects) and fairly presents the Company's financial condition, assets and liabilities as of their respective dates and the results of operations and cash flows for the periods related thereto.

2.7     **Undisclosed Liabilities**.  Except for those liabilities set forth on the face of the Financial Statements which have been incurred by Company in the ordinary course of Business, or liabilities specifically delineated on **Schedule 2.7** of the Disclosure Schedules, the Company does not and the Company, with respect to the Business does not, have any debts, liabilities or obligations of any nature (whether accrued, absolute, contingent, direct, indirect, perfected, inchoate, unliquidated or otherwise and whether due or to become due) arising out of transactions entered into at or prior to the Closing, or any transaction, series of transactions, action or inaction at or prior to the Closing, or any state of facts or condition existing at or prior to the Closing (regardless of when such liability or obligation is asserted), including liabilities or obligations on account of Taxes or governmental charges or penalties, interest or fines thereon or in respect thereof.

2.8     **Absence of Certain Changes, Events and Conditions**.  Except with respect to (i) events related to the Covid-19 global pandemic or expressly contemplated by the Agreement, or (ii) the assets contributed pursuant to the Contribution Agreement, since January 1, 2020, Company has operated in the ordinary course of business in all material respects and there has not been, with respect to Company, any:

-5-

EXHIBIT A

(a)     event, occurrence or development that has had or could reasonably be expected to have a Material Adverse Effect;

(b)     amendment of the organizational documents of Company;

(c)     split, combination or reclassification of any of Company's equity;

(d)     issuance, sale or other disposition of any of its membership interests, or grant of any options, warrants or other rights to purchase or obtain (including upon conversion, exchange or exercise) any of its stock;

(e)     intentionally omitted;

(f)     material change in any method of accounting or accounting practice of Company;

(g)     incurrence, assumption or guarantee of any indebtedness for borrowed money except unsecured current obligations and liabilities incurred in the ordinary course of business;

(h)     sale or other disposition of any of the assets shown or reflected on the Balance Sheet, except in the ordinary course of business;

(i)     make any exceptional increase in the compensation of any of its Employees other than as provided for in any written agreement;

(j)     adoption, amendment or modification of any Benefit Plan;

(k)     acquisition by merger or consolidation with, or by purchase of a substantial portion of the assets or equity of, or by any other manner, any business or any Person or any division thereof;

(l)     adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law; or

(m)     any agreement to do any of the foregoing, or any action or omission that would result in any of the foregoing.

2.9     **Material Contracts**

(a)     **Schedule 2.9** of the Disclosure Schedules lists each of the following agreements of Company or its Affiliates (collectively, the "**Material Contracts**"):

(i)     all agreements of Company involving aggregate consideration in excess of $20,000;

(ii)     intentionally omitted;

(iii)     intentionally omitted;

(iv)     except for agreements relating to trade receivables, all agreements relating to indebtedness (including guarantees) of Company, in each case having an outstanding principal amount in excess of $20,000;

-6-

EXHIBIT A

(v)     all employment agreements and agreements with independent contractors that cannot be terminated with notice or payment by the Company;

(vi)    all agreements with covenants limiting the rights of Company to conduct its business as currently conducted in any way or granting any exclusive rights, right of first refusal, right of first offer or similar right with respect to any of the assets of Company;

(vii)   all agreements involving any joint venture, royalty, partnership or similar arrangement; and

(viii)  all Intellectual Property Agreements material to the Business, other than (1) non-exclusive inbound licenses, terms of service, terms of use and similar agreements for commercially available off-the-shelf software, services or software-as-a-service platforms, (2) nondisclosure agreements, (3) agreements with current and former employees, (4) non-exclusive, non-negotiated licenses granted by Company to its customers in the ordinary course of business and (5) agreements otherwise covered in another subsection of this Section 2.9(a).

(b)     Company has made available to Buyer a complete and accurate copy of each Material Contract.  With respect to each Material Contract: (i) such Material Contract is legal, valid, binding and enforceable and in full force and effect and neither Company nor Seller has received notice or has reason to believe that the other party to such Material Contract intends to terminate such Material Contract; (ii) subject to Consent Rights, such Material Contract will continue to be legal, valid, binding and enforceable and in full force and effect immediately following the Closing in accordance with the terms thereof as in effect as of the date of this Agreement; and (iii) neither Seller nor, to Sellers' Knowledge, any other Person, is in breach or violation of, or default under, any provision of such Material Contract in any material respect, and no event has occurred, is pending or, to Sellers' Knowledge, is threatened, which, after the giving of notice, with lapse of time, or otherwise, would constitute a breach or default of any provision of such Material Contract by Company or, to Sellers' Knowledge, of any other party under such Material Contract in any material respect.  Neither Company nor Seller has received notice nor has reason to believe that any party to a Material Contract intends to terminate such Material Contract.  There are no material disputes pending or threatened under any Material Contract.

2.10    **Real Property**.  Except for month-to-month storage space rented in Houston, Texas used to store show-booth materials (at a cost of approximately $250 per month), the Company does not own or lease any Real Property.

2.11    **Intellectual Property**

(a)     Company does not have any registered intellectual property.  Seller and Company acknowledge that Company has submitted a patent application (USPTO Application #63/360,986) relating to the so-called GAMMA software ("**GAMMA**") and that GAMMA is the subject of a separate Software Assignment Agreement between Buyer, Company and each of the inventors of GAMMA. No other Person, including without limitation, any developer, programmer or independent contractor, has any interest, right or title to the use of GAMMA.  GAMMA is, as of the Effective Date, a Company asset.

(b)     Except to the extent it would not have a Material Adverse Effect, to Sellers' Knowledge, (i) the use of the Owned Intellectual Property in the Business as currently conducted does not infringe, misappropriate, or otherwise violate the Intellectual Property of any Person, and (ii) no Person has infringed, misappropriated, or otherwise violated any Owned Intellectual

EXHIBIT A

Property.  This Section 2.11(b) constitutes the sole representation and warranty of Seller under this Agreement with respect to any actual or alleged infringement, misappropriation or other violation by Seller and Company of the Intellectual Property of any other Person.

(c)     Company's information technology and computer systems ("**Systems**") necessary for Seller's conduct of the Business as currently conducted in all material respects are reasonably sufficient for Company's current needs and in materially sufficiently good working condition to perform all information technology operations.  Company has taken reasonable actions, consistent with applicable industry practices, to protect Company's Systems.

(d)     Company is in compliance in all material respects with all applicable Laws regarding the collection and use of personal information.  Company has implemented commercially reasonable policies, procedures and safeguards to protect the security of personal information in its possession against unauthorized use or access.  To Sellers' Knowledge, and except to the extent it would not have a Material Adverse Effect, the Business has not experienced any breach of security of any personal information in Company's control.

2.12    **Insurance**.  **Schedule 2.12** of the Disclosure Schedules sets forth a list, as of the date hereof, of all material insurance policies maintained by Company or the LLC or with respect to which Company or LLC is a named insured or otherwise the beneficiary of coverage (collectively, the "***Insurance Policies***").  The Insurance Policies are in full force and effect on the date of this Agreement and all premiums due on such Insurance Policies have been paid, except as would not have a Material Adverse Effect.

2.13    **Legal Proceedings; Governmental Orders**

(a)     There are no actions, suits, claims, investigations or other legal proceedings pending or, to Sellers' Knowledge, threatened against or by Company affecting any of its properties or assets (or by or against Seller or any Affiliate thereof and relating to Company) and there have not been any actions, suits, claims, investigations or other legal proceedings with respect to Company during the three years prior to the date of this Agreement.

(b)     There are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against or affecting Company or any of its properties or assets.

2.14    **Compliance With Laws; Permits**

(a)     Company is in material compliance with all Laws applicable to it or its business, properties or assets.

(b)     All Permits required for Company to conduct its business have been obtained by it and are valid and in full force and effect in all material respects.

(c)     None of the representations and warranties contained in this Section 2.14 shall be deemed to relate to employee benefits matters (which are governed by Section 2.15), employment matters (which are governed by Section 2.16) or tax matters (which are governed by Section 2.17).

2.15    **Employee Benefit Matters**

(a)     **Schedule 2.15** of the Disclosure Schedules contains a list of each material benefit, retirement, employment, consulting, compensation, incentive, bonus, equity option, incentive equity, phantom equity, change in control, severance, vacation, paid time off, welfare

-8-

**EXHIBIT A**

and fringe-benefit agreement, plan, policy and program, whether or not reduced to writing, in effect and covering one or more Employees, former employees of Company, current or former directors of Company or the beneficiaries or dependents of any such Persons, and that is maintained, sponsored, contributed to, or required to be contributed to by Company, or under which Company has any material liability (as listed on Schedule 2.15 of the Disclosure Schedules, each, a "**Benefit Plan**").

(b)       **Schedule 2.15** of the Disclosure Schedules contains a list of all current employees and contractors of the Company including their hire date and their current rate of pay.

(c)       To Sellers' Knowledge, each Benefit Plan complies with all applicable Laws.

(d)       There is no pending or, to Sellers' Knowledge, threatened action relating to a Benefit Plan; and no Benefit Plan has within the three years prior to the date hereof been the subject of an examination or audit by a Governmental Authority.

2.16    **Employment Matters**.

(a)       Company is not a party to, or bound by, any collective bargaining or other agreement with a labor organization representing any of its Employees.  There has not been during the three-year period prior to the date of this Agreement, nor, to Sellers' Knowledge, has there been during the three year period prior to the date of this Agreement any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor activity or dispute affecting the Company or its Affiliates.

(b)       Company is in and has been during the three years prior to the date of this Agreement in material compliance with all applicable Laws pertaining to employment and employment practices to the extent they relate to employees of Company or its Affiliates.  There have not been during the three years prior to the date of this Agreement and there are no actions, suits, claims, investigations or other legal proceedings against Company or its Affiliates pending, or to Sellers' Knowledge, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former employee of Company or its Affiliates, including, any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay or any other employment related matter arising under applicable Laws.

(c)       Except as set forth on **Schedule 2.16** of the Disclosure Schedules, to Sellers' Knowledge, no claims, injuries, fact, event or condition exists which would give rise to a claim by employees and former employees (including dependents and spouses) of the Company, in connection with the Business, under any workers compensation laws, regulations, requirements or programs.

(d)       Except as set forth on **Schedule 2.16** of the Disclosure Schedules, the Company is not a party to or obligated in connection with the Business with respect to any outstanding contracts with current or former employees, consultants, or advisers.  The Company and its Affiliates have materially complied with all applicable laws relating to the employment of labor, including provisions thereof relating to wages, hours, equal opportunity, collective bargaining and the payment of social security and other taxes.

2.17    **Taxes.**

**EXHIBIT A**

(a)     The Company has timely filed all federal, state, county, local and foreign Tax Returns which the Selling Parties are required to have filed, and such returns are, to the knowledge of Selling Parties, complete and correct in all material respects. Any deficiencies proposed as a result of any governmental audits have been paid or settled, and there are no present disputes as to Taxes payable by the Company (or Seller to the extent of employment related tax liabilities). There are no unexpired waivers and none of the Selling Parties is a party to any action or proceedings by any governmental authority for the collection or assessment of Taxes. No Selling Party is a "foreign person" as that term is used in Section 1.1445-2 of the Treasury Regulations under the Code. Company is not currently the beneficiary of any extension of time within which to file any Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business. All Taxes due and owing by Company have been paid or accrued.

(b)     No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Company.

(c)     There are no ongoing actions, suits, claims, investigations or other legal proceedings by any taxing authority against Company.

(d)     No written claim has been made by a Governmental Authority in a jurisdiction where the Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction.

(e)     There are no Encumbrances for Taxes (other than Taxes not yet due and payable) upon any of the assets of Company.

(f)     Company is not a party to any Tax-sharing agreement (other than commercial agreements entered into with third parties in the ordinary course of business, the principal purpose of which is not related to Taxes).

(g)     All Taxes which Company is obligated to withhold from amounts owing to any employee, creditor or third party have been withheld and paid over to the appropriate Governmental Authority.

(h)     Company has not been a "distributing corporation" or a "controlled corporation" in connection with a distribution described in Section 355 of the Code.

(i)     Company is not, and has not been, a party to any "reportable transaction," as defined in Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b).

(j)     Company will not be required to include any item of income in, or exclude any item or deduction from, taxable income for any Post-Closing Tax Period as a result of: (i) any change in a method of accounting under Section 481 of the Code (or any comparable provision of state, local or foreign Law) made prior to Closing, or use of an improper method of accounting prior to Closing; (ii) an installment sale or open transaction occurring prior to the Closing; (iii) a prepaid amount received on or prior to the Closing Date with regard to a transaction entered into prior to the Closing; (iv) any closing agreement under Section 7121 of the Code, or similar provision of state, local or foreign Law entered into prior to the Closing; or (v) any election under Section 108(i) of the Code made prior to the Closing.

2.18   **Brokers**. Except for Joe Fanelli (who shall be paid exclusively by Seller), and Doug Haugen (who shall be paid exclusively by Joe Fanelli), no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the

-10-

EXHIBIT A

transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller. Seller shall indemnify Buyer for any broker or finder claiming through Seller with respect to the transaction outlined herein.

2.19    **Title to Assets.**  All assets that relate in any way to the operation of the Business are owned by the Company free and clear of any claim, right or privilege of any other Person. Company has good and valid title to, or a valid interest in and to, the assets of the Company. To the extent that the assets are subject to a lien by a creditor, such liens will be paid off and released with the funds obtained from Buyer at Closing.

2.20    **Misrepresentation**.   None of the representations and warranties of Company or Seller set forth in this Agreement, in any of the certificates, schedules, lists, documents, exhibits, or other instruments delivered, or to be delivered, to Buyer as contemplated by any provision hereof, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained herein or therein not misleading.  There are no facts that have not been disclosed to Buyer which materially adversely affect or could materially adversely affect the Business or the Seller's ability to consummate the transactions contemplated hereby.

3.    **Representations and Warranties of Buyer**.  Buyer represents and warrants to Seller that the statements contained in this Section 3 are true and correct as of the date hereof.

3.1    **Authority of Buyer**.  Buyer has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

3.2    **No Conflicts; Consents**.  The execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (b) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any agreement to which Buyer is a party.  No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, except for such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

3.3    **Investment Purpose**.  Buyer is acquiring the Units solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof.  Buyer acknowledges that the Units are not registered under the Securities Act of 1933, as amended, or any state securities laws, and that the Units may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an

-11-

**EXHIBIT A**

applicable exemption therefrom and subject to state securities laws and regulations, as applicable. Buyer is able to bear the economic risk of holding the Units for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

3.4 **Brokers**.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

3.5 **Sufficiency of Funds**.  Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

3.6 **Legal Proceedings**.  There are no actions, suits, claims, investigations or other legal proceedings pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

4. **Covenants.**

4.1 **Confidentiality.**  Seller and Buyer will treat as confidential and will not use or disclose to others any Confidential Information unless:  (i) such information becomes publicly known through no fault of either party, (ii) it is otherwise required by applicable laws, rules, or regulations, (iii) at the time of disclosure such information is generally available to the public or after the time of disclosure such information becomes generally available to the public through no act of a Seller or Buyer; (iv) the Confidential Information is made available to the recipient by others who did not acquire such Confidential Information, directly or indirectly, from the Seller or Buyer, respectively; or (v) the Confidential Information is, due to time or change of business, obsolete and no longer used by the Business.  The term "**Confidential Information**" means any confidential or proprietary information relating to the Assets or the Business, whether contained in documents, electronic media or other forms, including, but not limited to, information about materials, procedures, inventions, processes, manufacturing, expertise, customer lists, potential customer lists, customer data, financial data, vendors, marketing plans, and trade secrets. Confidential Information includes, but is not limited to, the identities of customers, suppliers and business contacts of Seller with respect to the Business and the trade secrets and know-how of Seller with respect to the Company.

4.2 **Governmental Approvals and Other Third-party Consents**

(a)  Each party hereto shall, as promptly as possible, use its reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement.  Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals.  The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)  Seller and Buyer shall use commercially reasonable efforts to give all notices to, and obtain all consents from, all third parties that are listed on Schedule 2.5 attached

-12-

**EXHIBIT A**

DocuSign Envelope ID: A9D6D84D-8F4D-474E-A7D2-16B8FE7673A9

hereto; <u>provided</u>, <u>however</u>, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested.

4.3   **Books and Records**.

(a)   In order to facilitate the resolution of any claims made against or incurred by Seller or Company prior to the Closing, or for any other reasonable purpose, for a period of six (6) years after the Closing, Buyer shall:

(i)   retain the books and records (including personnel files) of Company relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of Company; and

(ii)   upon reasonable notice, afford the Representatives of Seller reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to such books and records.

(b)   Neither Buyer nor Seller shall be obligated to provide the other party with access to any books or records (including personnel files) pursuant to this <u>Section 4.3</u> where such access would violate any Law.

4.4   **Public Announcements**. Unless otherwise required by applicable Law, no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

4.5   **Further Assurances**. Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

4.6   **Taxes**.

(a)   All franchise, transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

(b)   Seller shall prepare and timely file, or cause to be prepared and timely filed, all Tax Returns required to be filed by Company or the LLC that are due on or before the Closing Date (taking into account any extensions), and shall timely pay or reserve for all Taxes that are due and payable on or before the Closing Date. Any such Tax Return shall be prepared in a manner consistent with past practice (unless otherwise required by Law).

(c)   Buyer shall prepare and timely file, or cause to be prepared and timely filed, all Tax Returns required to be filed by the LLC that are due after the Closing Date. Any such Tax Return shall be prepared in a manner consistent with past practice (unless otherwise required by Law). Any such income or other material Tax Return with respect to a Straddle Period shall be submitted by Buyer to Seller (together with schedules, statements and, to the extent requested by Seller, supporting documentation) at least thirty (30) days prior to the due date (including

-13-

**EXHIBIT A**

DocuSign Envelope ID: A9D6D84D-8F4D-474F-A7D2-16B8FE7673A9

extensions) of such Tax Return.  If Seller objects to any item on any such Tax Return that relates to a Pre-Closing Tax Period, it shall, within ten (10) days after delivery of such Tax Return, notify Buyer in writing that it so objects, specifying with particularity any such item and stating the specific factual or legal basis for any such objection.  If a notice of objection is duly delivered, Buyer and Seller shall negotiate in good faith and use their reasonable best efforts to resolve such items.  If Buyer and Seller are unable to resolve any such items within ten days after receipt by Buyer of such notice, the disputed items shall be resolved by the Independent Accountant and any determination by the Independent Accountant shall be final.  The Independent Accountant shall resolve any disputed items within ten (10) days of having the item referred to it pursuant to such procedures as it may require.  If the Independent Accountant is unable to resolve any disputed items before the due date for such Tax Return, the Tax Return shall be filed as prepared by Buyer and then amended to reflect the Independent Accountant's resolution.  The costs, fees and expenses of the Independent Accountant shall be borne equally by Buyer and Seller.  The preparation and filing of any Tax Return of the LLC that does not relate to a Pre-Closing Tax Period shall be exclusively within the control of Buyer.

(d)     Unless otherwise required to comply with applicable Law, Buyer shall not, and shall not cause or permit any of its Affiliates (including the LLC after the Closing) to (i) amend any Tax Return of the LLC for a Pre-Closing Tax Period, (ii) make any Tax election with respect to the LLC that has retroactive effect to any Pre-Closing Tax Period, (iii) voluntarily approach any Governmental Authority regarding any Taxes or Tax Returns of the LLC for any Pre-Closing Tax Period (including by means of any State or multistate voluntary disclosure program), or (iv) consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of Taxes for any Pre-Closing Tax Period, in each case without the prior written consent of Seller (which consent shall not unreasonably be withheld or delayed), if such action could reasonably give rise to an indemnification claim by Buyer or the LLC under this Agreement.

(e)     In the case of Taxes that are payable with respect to a Straddle Period**,** the portion of any such Taxes that are treated as Pre-Closing Taxes for purposes of this Agreement shall be based upon, or related to, income and expenses arising prior to the Closing Date, or required to be withheld, deemed equal to the amount which would be payable if the taxable year ended with the Closing Date. For the avoidance of doubt, an election will be made under Section 1377(a)(2) of the Code so as to cause any passthrough items allocated to Seller during the Straddle Period to include only those items incurred during the Pre-Closing Tax Period, and any passthrough items allocated to Buyer during the Straddle Period to include only those items incurred during the Post-Closing Tax Period.

(f)     Seller, Company, LLC and Buyer shall provide each other with such cooperation and information as any of them reasonably may request of the others in filing any Tax Return pursuant to this Section 4.6 or in connection with any audit or other proceeding in respect of Taxes of the LLC.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings or other determinations by tax authorities. Each of Seller, Company and Buyer shall retain all Tax Returns, schedules and work papers, records and other documents in its possession relating to Tax matters of the LLC for any Pre-Closing Tax Period until the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate.  Prior to transferring, destroying or discarding any Tax Returns, schedules and work papers, records and other documents in its possession relating to Tax matters of the LLC for

-14-

EXHIBIT A

any Pre-Closing Tax Period, Seller, Company, the LLC or Buyer (as the case may be) shall provide the other Parties with reasonable written notice and offer the other Parties the opportunity to take custody of such materials.

(g)     Seller shall be entitled to any refunds of Taxes of the LLC (or credits for overpayment or offset), including any interest received from a Governmental Entity, attributable to any Pre-Closing Tax Period (in the case of a Straddle Period, as determined pursuant to this Section 4.13) ("**_Tax Refund_**"); provided, however, that the amount of such Tax Refund shall be net of any related expenses reasonably incurred in connection with the preparation and filing of any Tax Return giving rise to such Tax Refund, and Tax Refunds shall exclude any Tax Refund to the extent treated as an asset in the calculation of Closing Working Capital or attributable to the carryback of a net operating loss or other Tax attribute from a Post-Closing Tax Period.  Buyer shall pay to Seller as additional consideration the amount of any such Tax Refund (or credit for overpayment or offset) within fifteen days of receipt thereof or entitlement thereto.

4.7     Right to Participate in Future Expeditions.  Following the Closing and for so long as Owner is living, but in all cases subject to the terms and conditions outlined in this Section 4.7, Owner and one companion shall have the right, free of charge (excluding transportation to and from the departing port) to participate in periodic all-inclusive fishing expeditions of the Company. Notwithstanding the foregoing, the following limitations shall apply: (i) expeditions shall be subject to actual availability from paying customers of the Company; (ii) such expeditions shall not exceed more than eight (8) weeks during any annual fishing season; (iii) share his knowledge and experience with Amazon Basin fishing with Business clientele; and (iv) Owner shall use commercially reasonable efforts to encourage paying customers to rebook future fishing trips with the Business.

5.     **Intentionally deleted.**

6.     **Indemnification**

6.1     **Survival**.  Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is eighteen (18) months from the Closing Date, except that Section 2.15 (Employee Benefit Matters) and Section 2.17 (Taxes) shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus sixty days.  None of the covenants or other agreements contained in this Agreement shall survive the Closing Date other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the period contemplated by its terms.  Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of such survival period and such claims shall survive until finally resolved.

6.2     **Indemnification By Seller**.  Subject to the other terms and conditions of this Section 6, Seller shall and does hereby indemnify Buyer against, and shall hold Buyer harmless from and against, any and all Losses incurred or sustained by, or imposed upon, Buyer based upon, arising out of, with respect to or by reason of:

EXHIBIT A

(a)  any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement;

(b)  any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement; or

(c)  all Pre-Closing Taxes, excluding any (1) Taxes resulting from the filing of any election after the Closing having retroactive effect to any Pre-Closing Tax Period, including under Section 338 of the Code or similar election for foreign, state or local income Tax purposes, and (2) Taxes incurred on the Closing Date but after the Closing that are outside the ordinary course of Company's business.

6.3  **Indemnification By Buyer**.  Subject to the other terms and conditions of this Section 6, Buyer shall and does hereby indemnify Seller against, and shall hold Seller harmless from and against, any and all Losses incurred or sustained by, or imposed upon, Seller based upon, arising out of, with respect to or by reason of:

(a)  any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement; or

(b)  any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement.

6.4  **Certain Limitations**.  The party making a claim under this Section 6 is referred to as the "**Indemnified Party**", and the party against whom such claims are asserted under this Section 6 is referred to as the "**Indemnifying Party**".  The indemnification provided for in Section 6.2 and Section 6.3 shall be subject to the following limitations:

(a)  The Indemnifying Party shall not be liable to the Indemnified Party for indemnification under Section 6.2(a) or Section 6.3(a), as the case may be, until the aggregate amount of all Losses in respect of indemnification under Section 6.2(a) or Section 6.3(a) exceeds $11,500 (the "**Deductible**"), in which event the Indemnifying Party shall only be required to pay or be liable for Losses in excess of the Deductible.  For purposes of calculating the amount of any indemnifiable Loss pursuant to this Section 6, the amount of such Loss shall be determined without regard to any materiality, Material Adverse Effect or other similar qualification contained in or otherwise applicable to such representation or warranty.

(b)  Payments by an Indemnifying Party pursuant to Section 6.2 or Section 6.3 in respect of any Loss shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Indemnified Party (or Company) in respect of any such claim.  The Indemnified Party shall use its commercially reasonable efforts to recover under insurance policies or indemnity, contribution or other similar agreements for any Losses prior to seeking indemnification under this Agreement.

(c)  Payments by an Indemnifying Party pursuant to Section 6.2 or Section 6.3 in respect of any Loss shall be reduced by an amount equal to any Tax benefit actually realized as a result of such Loss by the Indemnified Party.

(d)  In no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive (except to the extent required to be paid to the third party with respect to a Third Party Claim), incidental, consequential, special or indirect damages, including loss of future

-16-

EXHIBIT A

revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple.

6.5 **Indemnification Procedures**

(a) **Third-Party Claims**. If any Indemnified Party receives notice of the assertion or commencement of any action, suit, claim or other legal proceeding made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "**Third-Party Claim**") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party written notice thereof within fourteen (14) days of such Indemnified Party's receipt of such notice. Such notice by the Indemnified Party shall describe the Third-Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third-Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense. In the event that the Indemnifying Party assumes the defense of any Third-Party Claim, subject to Section 6.5(b), it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third-Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right, at its own cost and expense, to participate in the defense of any Third-Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. If the Indemnifying Party elects not to compromise or defend such Third-Party Claim or fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, the Indemnified Party may, subject to Section 6.5(b), pay, compromise, defend such Third-Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third-Party Claim. Seller and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any Third-Party Claim, including making available (subject to the provisions of Sections 4.3 and 4.5) records relating to such Third-Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party and management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third-Party Claim.

(b) **Settlement of Third-Party Claims**. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third-Party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed), except as provided in this Section 6.5(b). If a firm offer is made to settle a Third-Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third-Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within fourteen (14) days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third-Party Claim and, in such event, the maximum liability of the Indemnifying Party as to such Third-Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such

-17-

EXHIBIT A

firm offer and also fails to assume defense of such Third-Party Claim, the Indemnifying Party may settle the Third-Party Claim upon the terms set forth in such firm offer to settle such Third-Party Claim. If the Indemnified Party has assumed the defense pursuant to Section 6.5(a), it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

(c) **Direct Claims**. Any claim by an Indemnified Party on account of a Loss which does not result from a Third-Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim. During such thirty-day period, the Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to Company's or the LLC's (as the case may be) premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such thirty-day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

6.6 **Tax Treatment of Indemnification Payments**. All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

6.7 **Exclusive Remedies**. Subject to Section 8.11, the parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims (other than claims arising from fraud on the part of a party hereto in connection with the transactions contemplated by this Agreement for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Section 6. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this Section 6. Nothing in this Section 6.7 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled pursuant to Section 7.11, to seek any remedy on account of fraud by any party hereto.

7. **Miscellaneous**

EXHIBIT A

7.1 **Expenses**. Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

7.2 **Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with acknowledgment of receipt by the intended recipient); or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.2):

| If to Seller: | Reiss Technology Corp.<br>c/o Mr. Paul Reiss<br>315 Teetertown Road<br>Califon, New Jersey 07830<br>E-mail: acuteangling.com@gmail.com and<br>preiss@acuteangling.com |
| --- | --- |
| With a copy (which shall not constitute notice) to: | Mandelbaum Salsburg P.C.<br>3 Becker Farm Road<br>Roseland, New Jersey 07068<br>Attn: Barry M. Schwartz, Esq.<br>bschwartz@lawfirm.ms |
| If to Buyer: | Zach Porter Investments LLC<br>4003 N. Breeze Creek Pl.<br>Meridian, ID 83646<br>E-mail: zporter7@gmail.com |
| With a copy (which shall not constitute notice) to: | ClearVenture Legal PLLC<br>8554 Silverwood Way<br>Middleton, ID  83644<br>Attn: Matt Bradshaw, Esq.<br>matt@clearventurelegal.com |

7.3 **Interpretation**. For purposes of this Agreement: (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Sections, Disclosure Schedules and Exhibits mean the Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and

**EXHIBIT A**

modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

7.4    **Headings**. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

7.5    **Severability**. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

7.6    **Entire Agreement**. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

7.7    **Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

7.8    **No Third-party Beneficiaries**. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

7.9    **Amendment and Modification; Waiver**. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

EXHIBIT A

7.10    **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**

(a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.  SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT.  THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.10(c).

7.11    **Specific Performance**.  The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to seek specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

7.12    **Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by e-mail or other means of electronic transmission (e.g., DocuSign or similar service) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

7.13    **Tax Differential**.  Owner and Seller are claiming that Buyer should reimburse Seller for the extra tax burden which Owner will incur as a result of accommodating Buyer for the tax structure utilized in this transaction (the "**Tax Differential**").  Owner and Seller hereby agree

-21-

EXHIBIT A

that the Tax Differential shall not exceed $25,800.  Owner, Seller and Buyer hereby agree that Buyer shall discuss the Tax Differential with Buyer's accountant ("**Mendy**") by December 16, 2021.  If Mendy believes that Seller is entitled to the full Tax Differential, Buyer shall wire $25,800 to Seller, using wire information to be provided in writing, within three (3) days following Mendy's determination, which Buyer shall require Mendy to make by December 23, 2021.   If Mendy does not believe that Seller is entitled to the full Tax Differential, Buyer shall, within three (3) days following Mendy's determination, arrange for Mendy to contact Seller's accountant ("**Dave Roth, CPA**") to discuss.  Seller, Owner and Buyer hereby agree to be bound by the mutual decision made by Mendy and Dave Roth, CPA as to Seller's entitlement (if any) to the Tax Differential, and to the amount of such payment.

(The remainder of this page is left intentionally blank. Signature page follows.)

4864-8098-4068, v. 4

EXHIBIT A

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above.

**BUYER:**

**ZACH PORTER INVESTMENTS LLC**

By: _____

Name:  Zach Porter

Its: Manager

**SELLER:**

**REISS TECHNOLOGY CORP**.

By: _____

Paul Reiss, President

**OWNER**:

_____

Paul Reiss

*Agreed and acknowledged by*:

_____

Helen Reiss

-23-

EXHIBIT A

**EXHIBIT A**
**DEFINITIONS**

The following terms have the following meanings:

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Brazil Exception**" means that the laws of the Country of Brazil and/or documents signed by the Company or the LLC which are subject to Brazilian law may prohibit or conflict with the representations and warranties being made.

"**Business**" means Company's current business of operating a high-end destination fishing operation and related activities associated to such business activities.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in the State of Delaware are authorized or required by Law to be closed for business.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the recitals.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement.

"**Dollars or $**" means the lawful currency of the United States.

"**Employees**" means those Persons employed by Company or its Affiliates immediately prior to the Closing.

"**Encumbrance**" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance.

'**Funds Flow**" means that certain funds flow statement prepared in connection with the Closing and executed by both Seller and Buyer which sets forth the wiring instructions and amounts of payments to be made to the Seller and each creditor of Seller identified thereunder.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Indebtedness**" means any indebtedness for borrowed money (including guarantees of any kind whatsoever), including interest-bearing debt, including all accrued and unpaid interest

4864-8098-4068, v. 4          EXHIBIT A

DocuSign Envelope ID: A9D6D84D-8F4D-474E-AFD2-16B8FE7673A9

thereon and any other fees, costs and expenses payable to holders thereof in connection with the payoff and termination of such indebtedness, and all obligations in respect of capital leases.

"**Independent Accountant**" means a national or regional accounting firm with no prior relationship to Seller or Buyer or any of its Affiliates.

"**Intellectual Property**" means any and all of the following in any jurisdiction throughout the world: (a) trademarks and service marks, including all goodwill connected with the use of and symbolized by the foregoing; (b) copyrights and other published and unpublished works of authorship, including audiovisual works, software, databases and sound recordings; (c) trade secrets and confidential know-how; (d) patents, inventions, discoveries, improvements, methods and processes; (e) internet domain name registrations; and (f) other intellectual property and related proprietary rights, interests and protections, in each case whether arising under statutory law, common law, or by contract, and whether or not registered or issued, including all applications, registrations and issuances with respect thereto.

"**Knowledge of Seller or Sellers' Knowledge**" or any other similar knowledge qualification, means the actual or constructive knowledge after due inquiry of the following persons: Paul Reiss, Helen Reiss, and Garry Reiss.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Losses**" means actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees.

"**Made available**" means that the applicable document was made available for review to Buyer prior to the date hereof whether or not such document was requested or actually reviewed by Buyer.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is materially adverse to (a) the business, results of operations, financial condition or assets of Company, or (b) the ability of Seller to consummate the transactions contemplated hereby; provided, however, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which Company operates; (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer; (vi) any changes in applicable Laws or accounting rules; (vii) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with Company; (viii) any natural or man-made disaster or acts of God; or (ix) any failure by Company to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded).

"**Owned Intellectual Property**" means all Intellectual Property owned by Company and used in connection with the Business.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, and consents required to be obtained from Governmental Authorities.

"**Permitted Encumbrances**" means (a) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures; (b) mechanics, carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business; (c) those items of Indebtedness set forth on the Funds Flow which will be paid off in connection with the Closing on or about the Closing Date; (d) other imperfections of title or Encumbrances, if any, that have not had, and would not have, a Material Adverse Effect

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on and including the Closing Date.

"**Pre-Closing Taxes**" means Taxes of Company or the LLC for any Pre-Closing Tax Period (including Taxes allocated to Company or the LLC for the portion of any Straddle Period ending on and including the Closing Date pursuant to <u>Section 4.13</u>).

"**Post-Closing Tax Period**" means any taxable period beginning after the Closing Date and the portion of any Straddle Period beginning after the Closing Date.

"**Real Property**" means the real property owned, leased or subleased by Company, together with all buildings, structures and facilities located thereon.

"**Representative**" means, with respect to any Person, such Person and/or any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Straddle Period**" means any taxable period that begins on or before the Closing Date and ends after the Closing Date

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

EXHIBIT A

**Schedule 2.5**
**Consents Needed**

1. Travel Risk and Crisis Management Services Agreement dated December 5, 2018, made by and between Reiss Technology Corp., d/b/a Acute Angling, and Global Rescue LLC. Agreement not assignment except with prior written consent of Global Rescue.

2. Employee Confidentiality and Non-Disclosure Agreement dated February 23, 2021, made by and between Reiss Technology Corp., d/b/a/ Acute Angling, and Arden Debelle. Agreement not assignable without employee's consent.

4864-8098-4068, v. 4

EXHIBIT A

**Schedule 2.7**
**Undisclosed Liabilities**

None.

EXHIBIT A

## Schedule 2.9
## Material Contracts

**(i)    All agreements of Company involving aggregate consideration in excess of $20,000:**

1.  Binding Letter of Agreement dated April 17, 2018, by and between Acute Angling and Joseph Fanelli for brokerage services.

2.  Employment Contract dated September 18, 2019, by and between Charlie Balfour and Acute Angling for full-time employment as a Chief Information Officer.

3.  Employment Contract dated February 23, 2021 by and between Arden Debelle and Acute Angling for part-time employment as an administrative assistant.

4.  Travel Risk and Crisis Management Services Agreement dated December 5, 2018 made by and between Reiss Technology Corp., d/b/a Acute Angling, and Global Rescue LLC for field rescue and emergency services.  Although the term of this Agreement has expired on its face, Global Rescue LLC continues to submit invoices for such coverage, and the Company continues to pay such invoices.

**(ii)    All agreements that relate to the sale of any of Company's assets, other than in the ordinary course of business, for consideration in excess of $20,000:**

See documents identified in Subsection (iv) below.

…

***(iv) Except for agreements relating to trade receivables, all agreements relating to indebtedness (including guarantees) of Company, in each case having an outstanding principal amount in excess of $20,000:***

1.  Loan Agreement dated July 14, 2016, by and between Paul Reiss (the "Lender") and Noberto Guedes dos Santos e Silva (the "Borrower") for the principal amount of $100,000.00 to be repaid in consecutive annual installments of $33,333.00 until maturity on July 1, 2019; Loan secured by Blackwater Explorer Yacht.

2.  Loan Agreement dated December 14, 2016, by and between Paul Reiss (the "Lender") and Wellington Araujo Melo (the "Borrower") for the principal amount of $50,000.00 to be repaid in consecutive annual installments of $12,5000.00 until maturity on January 1, 2021; Loan secured by Picapau Island Lodge on the Rio Jatapo.

3.  Loan Agreement dated June 18, 2018, by and between Paul Reiss (the "Lender") and Noberto Guedes dos Santos e Silva and Wellington Araujo Melo (the "Borrowers") for the principal amount of $115,000.00 to be repaid in consecutive annual installments of $23,000.00 until maturity on July 1, 2023; Note secured by Floating Bungalows.

EXHIBIT A

4. Promissory Note dated June 18, 2018, by and between Paul Reiss (the "Lender") and Norberto Guedes dos Santos e Silva and Wellington Araujo Melo (the "Borrowers") for the principal sum of $115,000.00 to be repaid in consecutive annual installments of $23,000.00 until maturity on July 1, 2023; Note secured by Floating Bungalows.

5. Loan Agreement dated June 21, 2019, by and between Paul Reiss (the "Lender") and Noberto Guedes dos Santos e Silva and Wellington Araujo Melo (the "Borrowers") for the principal amount of $250,000.00 to be repaid in consecutive annual installments of Fifty Percent (50%) of Blackwater Adventurer's annual operational profits until maturity on April 1, 2030; Loan secured by Blackwater Adventurer.

6. Promissory Note dated June 21, 2019, by and between Paul Reiss (the "Lender") and Noberto Guedes dos Santos e Silva and Wellington Araujo Melo (the "Borrowers") for the principal amount of $250,000.00 to be repaid in consecutive annual installments of 50% of Blackwater Adventurer's operational profits until maturity on April 1, 2030; Note secured by Blackwater Adventurer.


***(vii) All agreements involving any joint venture, royalty, partnership or similar arrangement:***

1. NG – Amazon Sportfishing Partnership Agreement dated July 31, 2021, by and between Acute Angling and Da Silva Navegacoes e Turismo in formation of a cooperative partnership for the purpose of delivering sportfishing trips in Brazil.

2. WM – Amazon Sportfishing Partnership Agreement date July 31, 2021, by and between Acute Angling and Wellington de Araujo Melo in formation of a cooperative partnership for the purpose of delivering sportfishing trips in Brazil.

EXHIBIT A

## Schedule 2.12
## Insurance

| Carrier | Type of Policy | Policy # | Cost |
|---|---|---|---|
| The Hartford | Business owner's general liability | 12-SBA-TM4533 | $794/yr. |
| Steadfast | Travel agents & tour operators professional liability insurance | EOL5421050-16 | $3,398.15/yr. |
| The Hartford | Workers Comp and Employer's Liability (NJ, PA and TX) | 76 WEG AE1 T0H | $651/yr. |
| Global Rescue, LLC | Field rescue/emergency transport | Contract | $_____ |

-31-

EXHIBIT A

<u>Schedule 2.15</u>
**Benefit Plans and**
**List of Employees and Independent Contractors**

<u>Employee Benefits</u>

1. Charlie Balfour
   a. Health Care Coverage through Keystone Health Plan
   b. Dental benefits through Delta Health Care
   c. Paid Time off
      i. Four (4) weeks of paid vacation
      ii. Five (5) days of paid sick leave
      iii. Bereavement leave may be granted

2. Arden Debelle
   a. Health care benefits
   b. Paid Time Off
      i. Two (2) weeks of paid vacation
      ii. Five (5) days of paid sick leave
      iii. Bereavement leave may be granted

(b)    **Schedule 2.15 of the Disclosure Schedules contains a list of all current employees and contractors of the Company including their hire date and their current rate of pay:**

| Employee | Employee or IC | Title | Salary |
|---|---|---|---|
| Paul Reiss | Employee | Manager | None |
| Garry Reiss | Employee | General Manager | $50,000/year |
| Helen Reiss | Employee | Gamma Project Manager | $50,000/year |
| Brent Moreland | Employee | Director of Sales and Trip Coordinator | $50,000/year |
| Joe Fanelli | Employee | VP Business Development | None |
| Charlie Balfour | Employee | Chief Information Officer | $85,000/year |
| Arden Debelle | Employee | | $20.00/hour |

…

4864-8098-4068, v. 4

EXHIBIT A

**Schedule 2.16**
**Claims by Employees**

None.

EXHIBIT A

## FUNDS FLOW

CLOSING DATE:        December 10, 2021

BUYER:               Zach Porter Investments, LLC

SELLER:              Reiss Technology Corp.

INSTRUMENT:          Membership Interest Purchase Agreement by and between Buyer #1 and Seller dated December 10, 2021 ("**MIPA**") for Units of the Company

COMPANY:             Acute Angling, LLC, a Delaware limited liability company ("Company")

---

Purchase Price due from Buyer to Seller                    $1,200,000.00
Less:  Deposit                                             (10,000.00)

   **Gross Purchase Price to Seller at Closing**             **$1,190,000.00**

Commission Due to Joe Fanelli:   $84,000
  Less:

  Finder's Fee to Doug Haugen          ($17,500)               ($17,500)
  Net Commission to Joe Fanelli:       $66,500                 ($66,500)

  **Net Purchase Price from Buyer to Seller:**              **$1,106,000.00**

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

**Disbursements:**

From Buyer to Seller:          $1,106,000
From Buyer to Joe Fanelli:     $66,500 (being wired to Mandelbaum Salsburg P.C.)
From Buyer to Doug Haugen:     $17,500

[Remainder of page is blank]

**EXHIBIT B**

4863-2998-9124, v. 3

(1)     Funds are to be wired to Seller and others in accordance with the wire instructions set forth on <u>Exhibit A</u> attached hereto.

<u>AGREEMENT OF PARTIES</u>:

(1)     Buyer and Seller agree and acknowledge that each has reviewed and approved the information, including but not limited to the credits, debits and payments, contained hereinabove.

(2)     Each of Buyer and Seller acknowledges receipt of a copy of this Closing Statement and acknowledges that it truly represents the cash payments due at the Closing in accordance with the MIPA.  In the event of any conflict between the terms of this Closing Statement and the terms of the MIPA, the MIPA shall control.

(3)     Capitalized terms used but not defined herein shall have the meanings given to those terms in the MIPA.

[Signature Page Follows]

4863-2998-9124, v. 3                          EXHIBIT B

IN WITNESS WHEREOF, Buyer and Seller have executed this Closing Statement the day and year first above written.

**SELLER:**                                    **BUYER:**

**REISS TECHNOLOGY CORP**.              **ZACH PORTER INVESTMENTS LLC**


By: _____          By: _____
Paul Reiss, President                    Name: Zach Porter
                                         Title: Member


*(Signature Page to Funds Flow for Acute Angling, LLC)*

3

<span style="color:red">EXHIBIT B</span>

## Exhibit A

### Wire Instructions

<u>Paul Reiss</u> (sole shareholder of Reiss Technology Corp.):

Amount: $1,106,000
Bank: Bank of America, 100 W. 33rd Street, NY, NY 10001
ABA: # REDACTE 3
For Account of: Merrill Lynch Pierce Fenner and Smith, NY, NY
Account # ████████ 6
For further credit to: Paul Reiss
Account # REDAC 0

<u>Doug Haugen</u>:

Amount: $17,500
ABA Routing #: REDACT 4
Bank Name: SunTrust Bank, 5305 Windward Parkway, Alpharetta, GA 30009
Account Number: REDACTE 4
Beneficiary Information: Innovative Travel Acquisitions, Inc.

<u>Joe Fanelli</u>:

Amount: $66,500

ABA Routing #: REDACTE 3
Bank Name: Valley National Bank
Account Number: REDACT 2
Beneficiary Information: Mandelbaum Salsburg P.C. *

(*Mandelbaum to wire funds to Joe Fanelli once wire information is confirmed)

EXHIBIT B

**Caution:** External eMail

Received.

J

On Dec 13, 2021, at 4:22 PM, Barry M. Schwartz <bschwartz@lawfirm.ms> wrote:

Joe:  Attached is a wire confirmation.  Kindly verify receipt. Thanks.

**Barry M. Schwartz** | Partner
(973) 585-3159
bschwartz@lawfirm.ms
<image001.jpg>
Mandelbaum Salsburg P.C.
3 Becker Farm Road
Roseland, NJ 07068
*This email and any attachments are intended solely for the recipient to whom it is addressed. It may also be an attorney-client communication, and as such is privileged and confidential. Any unauthorized review, use, disclosure or copying of this message is strictly prohibited. If you are not the intended recipient or have received this email in error, delete it immediately and notify the sender.*
<Mail Attachment.eml>

1
EXHIBIT B