UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ZACH PORTER INVESTMENTS, LLC, an Idaho Limited Liability Company,<br><br>　　　　Plaintiff,<br>v.<br><br>REISS TECHNOLOGY CORP., a New Jersey Corporation; PAUL REISS, an individual resident of New Jersey; JOSEPH FANELLI, an individual resident of California; DAVE ROTH, an individual resident of New Jersey; and ROSENBURG RICH BAKER BERMAN, P.A., a New Jersey Professional Corporation,<br><br>　　　　Defendants. | Case No. 1:23-cv-00249-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court are two Motions to Dismiss for lack of personal jurisdiction: one filed by Defendants Reiss Technology Corp. ("RTC") and Paul Reiss (Dkt. 19), and another filed separately by Defendants Dave Roth and Rosenberg Rich Baker Berman, P.A. ("RRBB"). Dkt. 20. Having reviewed the record, the Court finds the parties have adequately presented the facts and legal arguments in their briefs. Accordingly, in the interest of avoiding further delay, and because the Court finds the decisional process would not be significantly aided by oral argument, the Court decides the pending motions on the record and without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B).

Upon review, and for the reasons set forth below, the Court denies Reiss and RTC's

Motion to Dismiss (Dkt. 19) and grants Roth and RRBB's Motion to Dismiss (Dkt. 20).

## II. BACKGROUND[1]

Plaintiff Zach Porter Investments, LLC ("Porter Investments") is an Idaho limited liability company with its principal place of business in Idaho. Porter Investments' sole member is Zachery Porter, an individual and resident of Idaho. Defendants include RTC, a New Jersey corporation with its principal place of business in New Jersey; Reiss, an individual and current resident of South Carolina[2]; Joseph Fanelli[3] an individual and resident of California; Roth, an individual and resident of New Jersey; and RRBB, a New Jersey professional corporation with its principal place of business in New Jersey.

Porter is a businessman and fly-fishing enthusiast who wanted to purchase a business involving fishing. Prior to December 2021, RTC offered luxury sportfishing excursions in Brazil's Amazon River Basin under the assumed name "Acute Angling."[4] Acute Angling solicited refundable deposits and prepayments for fishing trips from tourists, and then used most of the money to pay its two independent contractors in Brazil to fulfill the trips. Porter first learned about Acute Angling from an advertisement for an

---

[1] Unless otherwise referenced, the following facts are from Porter Investments' Complaint (Dkt. 1) and Porter's Affidavit (Dkt. 23-1) in Response to Reiss, RTC, Roth, and RRBB's (collectively hereinafter "Defendants") Motions to Dismiss. For purposes of the instant Motions to Dismiss, the Court accepts the uncontroverted allegations in Porter Investments' Complaint as true, and resolves any conflicts between the parties over statements contained in affidavits in Porter Investments' favor. *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 608 (9th Cir. 2010); *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008).

[2] Reiss was a resident of New Jersey during the events leading up to this suit, but relocated to South Carolina after Porter Investments filed its Complaint. Dkt. 31, ¶ 2.

[3] Fanelli answered Porter Investments' Complaint on September 13, 2023 (Dkt. 18) and has not challenged the Court's personal jurisdiction.

[4] Acute Angling, LLC is a Delaware limited liability company.

"Amazon Jungle Deluxe Sport Fishing and Adventure Company," listed on a website called "BizBuySell." Dkt. 23-1, Ex. A-8. The listing was posted by a business broker named Doug Haugen, on behalf of his principals, Reiss and RTC.

On May 21, 2021, Porter submitted an inquiry to BizBuySale about the advertised fishing company. Porter's inquiry provided his Idaho telephone number as his contact number. *Id*., Ex. A-9. Haugen's response email included a Non-Disclosure Agreement ("NDA") for Porter to sign, and also requested that Porter provide additional information about himself. *Id*., Ex. A-7. Porter signed the NDA and emailed it back to Haugen. In his response email, Porter stated, "I work in real estate development in the Boise area. I am an avid fly fisherman and would like to own a business revolving around fishing." *Id*. Haugen subsequently connected Porter with Reiss, RTC, and Fanelli by email. After Haugen did so, Fanelli took over as the business broker in touch with Porter on behalf of Reiss and RTC as his principals.

Shortly thereafter, Fanelli invited Porter to go fishing in Idaho to learn more about Acute Angling. During the Idaho fishing trip, Fanelli represented that Acute Angling was successful. In making this representation, Fanelli made it clear that he was acting on behalf of Reiss and RTC. The following day, Fanelli invited Porter to his home in Victor, Idaho, to have a remote conference about Acute Angling with Reiss. Porter went to Fanelli's Idaho home for the conference, during which Reiss and Fanelli represented that Acute Angling was successful, with many prepaid bookings set for future fishing seasons.

After Porter's Idaho fishing trip with Fanelli, and remote conference with Reiss from Fanelli's Idaho home, Porter received emails from Reiss, as well as a letter and

numerous emails from Fanelli as Reiss and RTC's agent, making representations about the financial strength of Acute Angling. Porter was in Idaho when he received each of these communications.

Later in 2021, Porter visited Reiss in New Jersey at the home of Reiss's brother, Garry Reiss. During that meeting, Porter told Reiss that he was from Idaho. Porter also met with Roth, RTC's accountant and the managing partner and CEO of RRBB, during the meeting at Garry Reiss's home. Porter alleges Roth made negligent misrepresentations about Acute Angling's financial health during the meeting, including that the financials Porter had received from Reiss and Fanelli were accurate.

Fanelli, Reiss, and Roth's statements caused Porter to believe that Acute Angling was highly profitable and solvent. After the meeting at Garry Reiss's home in New Jersey, Porter engaged Matt Bradshaw, an Idaho attorney who lives in Idaho, to negotiate and purchase a 60% interest in Acute Angling (hereinafter the "Securities") on behalf of Porter Investments. Bradshaw subsequently negotiated with Reiss and RTC's attorney, Barry Schwartz, via telephone and email. Bradshaw was in Idaho when he participated in such negotiations.

On November 8, 2021, Schwartz sent Bradshaw an email proposing a deal structure for Porter Investments' purchase of the Securities. Porter subsequently executed a Membership Interest Purchase Agreement ("Agreement") and Funds Flow document while in Idaho, via Docusign. To effectuate the purchase, Porter wired $1,106,000.00 from his Idaho's bank account to Reiss's personal account at Bank of America. Porter also wired Reiss an addition $86,000.00 from his Idaho bank account to cover Fanelli's commission

and to offset certain tax inefficiencies.

Upon purchasing the Securities, Porter Investments became 60% owner of Acute Angling and RTC became 40% owner. The parties also executed an Operating Agreement with an effective date backdated to November 12, 2021. The Operating Agreement made Porter Investments the manager of Acute Angling, and "created innumerable bilateral obligations between RTC and Porter Investments." Dkt. 23-1, ¶ 13. From closing until March 1, 2023, Reiss remained in control of Acute Angling's operations and served as its president.

After closing, Porter Investments began to uncover pervasive accounting irregularities within Acute Angling, as well as many alleged fraudulent misrepresentations Reiss and Fanelli had made to induce Porter Investments' purchase of the Securities. As a result of such irregularities, Porter was "forced to loan Acute Angling hundreds of thousands from [his] own funds." *Id*., ¶ 14. Porter eventually learned Acute Angling was insolvent, and the business relationship between the parties deteriorated until March 1, 2023, when Reiss resigned as Acute Angling's president. At the time of Reiss's resignation, Acute Angling had a balance sheet of negative $1,240,000.00.

On May 12, 2023, Porter Investments filed the instant Complaint (Dkt. 1), seeking to recover $1,526,500.00, plus other damages in an amount to be proven at trial, to remedy losses it suffered while engaged in business with Reiss and RTC. Porter Investments brings claims for breach of contract, securities fraud under the Idaho Uniform Securities Act, Idaho Code Section 30-14-101 et seq., negligent misrepresentation, common-law fraud, breach of the covenant of good faith and fair dealing, and piercing the corporate veil/alter

ego liability.[5]

On September 13, 2023, Reiss and RTC filed a Motion to Dismiss (Dkt. 19), and Roth and RRBB separately filed another. Dkt. 20. Brought pursuant to Federal Rule of Civil Procedure 12(b)(2), both Motions to Dismiss argue the Court lacks personal jurisdiction due to Defendants' insufficient contacts with the State of Idaho. After the Motions to Dismiss were fully briefed, this case was reassigned, from United States Magistrate Judge Candy W. Dale to the undersigned, on November 7, 2023.

### III. LEGAL STANDARD

When a defendant moves to dismiss a case pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the exercise of personal jurisdiction is appropriate. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). Where, as here, a defendant's motion to dismiss is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts" to avoid dismissal. *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990).

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Because Idaho's long-arm statute—Idaho Code Section 5-514—would permit broader jurisdiction

---

[5] Porter Investments does not allege each of its claims against all Defendants. Instead, Porter Investments brings its claims for: (1) breach of contract against RTC; (2) securities fraud under the Idaho Uniform Securities Act against RTC, Reiss, and Fanelli; (3) negligent misrepresentation against Fanelli, Roth, and RRBB; (4) common-law fraud against RTC, Reiss, and Fanelli; (5) breach of the covenant of good faith and fair dealing against RTC and Reiss; and (6) piercing the corporate veil/alter ego liability against Reiss. *Id.*

than that authorized under the Due Process Clause of the Fourteenth Amendment, the Court need only look to the Due Process Clause to determine personal jurisdiction. *Wells Cargo, Inc. v. Transport Ins. Co.*, 676 F. Supp. 2d 1114, 1119 (D. Idaho 2009). "Thus, under Idaho law, the jurisdictional analysis and the federal due process analysis are the same." *Id.*

The exercise of personal jurisdiction over a defendant comports with due process if the defendant "has 'certain minimum contacts' with the relevant forum such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Sufficient minimum contacts can result in general or specific jurisdiction. *Schwarzenegger*, 374 F.3d at 801. However, unless a "defendant's contacts with a forum are so substantial, continuous, and systematic that the defendant can be deemed to be 'present' in the forum for all purposes, a forum may exercise only 'specific' jurisdiction—that is, jurisdiction based on the relationship between the defendant's forum contacts and the plaintiff's claim." *Yahoo! Inc.*, 433 F.3d at 1205. Because Porter Investments concedes that the Defendants are not subject to general personal jurisdiction, the Court considers solely whether Defendants are subject to specific personal jurisdiction in Idaho. Dkt. 23, at 4.[6]

The Ninth Circuit uses a three-prong test to determine whether a defendant has sufficient minimum contacts for the exercise of specific personal jurisdiction:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege

---

[6] Page citations are to the ECF-generated page number.

of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802.

The plaintiff bears the burden of satisfying the first two prongs of the aforementioned test. *Id.* "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id.* "On the other hand, if the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable." *Menken v. Emm*, 503 F.3d 1050, 1057 (9th Cir. 2007) (cleaned up). "All three prongs must be met to exercise personal jurisdiction over the defendant." *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023).

## IV. ANALYSIS

Having outlined the factual background and legal standard applicable to both pending Motions to Dismiss, the Court individually assesses each, beginning with the Motion to Dismiss filed by Reiss and RTC.

### A. Reiss and RTC's Motion to Dismiss (Dkt. 19)

#### 1. *Purposeful Availment and Purposeful Direction*

The first two prongs of the specific jurisdiction test consider "the extent of the defendant's contacts with the forum and the degree to which plaintiff's suit is related to

those contacts." *Menken*, 503 F.3d at 1058. The first prong "may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof." *Yahoo!*, 433 F.3d at 1206.

In evaluating the first prong, the Ninth Circuit typically distinguishes between cases sounding in contract and those sounding in tort. *Schwarzenegger*, 374 F.3d at 802. In contract actions, the inquiry considers whether a defendant "purposefully avails itself of the privilege of conducting activities or consummates a transaction in the forum, focusing on activities such as delivering goods or executing a contract." *Yahoo!*, 433 F.3d at 1206 (cleaned up). In tort cases, the inquiry assesses whether the defendant "purposefully directs his activities at the forum state[.]"*Id.* (cleaned up). However, rather than imposing a "rigid dividing line" between contract and tort cases, the Ninth Circuit has highlighted that both "purposeful availment and purposeful direction ask whether defendants have voluntarily derived some benefit from their interstate activities such that they will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Davis*, 71 F.4th at 1162 (quoting *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020)). Thus, "courts should comprehensively evaluate the extent of the defendant's contacts with the forum state and those contacts' relationship to the plaintiffs' claims—which may mean looking at both purposeful availment and purposeful direction." *Davis*, 71 F.4th at 1162. Such comprehensive analysis is particularly appropriate where, as here against Reiss and RTC, a plaintiff brings contract and tort claims. The Court accordingly considers both purposeful availment and purposeful direction with respect to Reiss and RTC, and finds, under either test, such defendants

purposefully established minimum contacts with Idaho.

a.  Purposeful Availment

The purposeful availment analysis "turns upon whether the defendant's contacts are attributable to his own actions or solely to the actions of the plaintiff." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 840 (9th Cir. 1986). Jurisdiction is proper "where the contacts proximately result from actions by the defendant *himself* that create a substantial connection with the forum state." *Asahi Metal Indus. Co. v. Sup. Ct. of California,* 480 U.S. 102, 109 (1987) (emphasis in original). Thus, rather than the plaintiff's contacts with the forum or the defendant's contacts with the plaintiff, "it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Walden v. Fiore*, 571 U.S. 277, 285 (2014).

"To have purposefully availed itself of the privilege of doing business in the forum, a defendant must have performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." *Boschetto*, 539 F.3d at 1016 (cleaned up). While the "formation of a contract with a nonresident defendant is not, standing alone, sufficient to create jurisdiction," *id.* at 1017, business activity constitutes purposeful availment "when that activity reaches out and creates '*continuing relationships and obligations*' in the forum state." *Silk v. Bond*, 65 F.4th 445, 457 (9th Cir. 2023) (emphasis in original) (quoting *Boschetto*, 539 F.3d at 1017)). As such, "[p]urposeful availment can be established by a contract's negotiations, its terms, its contemplated future consequences, and the parties' actual course of dealing." *Davis*, 71 F.4th at 1163; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985) ("It is these factors—prior negotiations

and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."). Considering such factors, the Court finds Reiss and RTC purposefully availed themselves of the privilege of doing business in Idaho.

First, although a defendant's physical presence in the forum is not a prerequisite to jurisdiction, *Burger King*, 471 U.S. at 476, here Fanelli—Reiss and RTC's agent[7]—was not only present in Idaho to initially discuss Acute Angling with Porter, but also took Porter fishing in Idaho and facilitated a remote conference between Porter and Reiss from his Idaho home. "For purposes of personal jurisdiction, the actions of an agent are attributable to the principal." *Sher*, 911 F.2d at 1362 (citing *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 419 (9th Cir. 1977)). As such, Fanelli's physical presence in Idaho "is certainly a relevant [jurisdictional] contact." *Walden*, 571 U.S. at 285.

Second, after Porter initiated contact with Reiss and RTC,[8] Fanelli solicited Porter's investment during the Idaho fishing trip, and again the next day at the remote conference with Reiss. During the remote conference, Reiss and Fanelli purportedly fraudulently misrepresented that Acute Angling was lucrative, with many prepaid bookings set for

---

[7] Reiss and RTC do not dispute that Fanelli acted as their agent. *See, e.g.*, Dkt. 19-1, Dkt. 27; Dkt. 31.

[8] Although Porter first approached Reiss and RTC through BizBuySell, the Ninth Circuit has repeatedly held that a defendant purposefully availed itself of the forum by undertaking continuing obligations to a forum resident, even when the forum resident initiated the business relationship. *See, e.g., Sher*, 911 F.2d at 1362–64; *Roth v. Garcia Marquez*, 942 F.2d 617, 621–22 (9th Cir. 1991); *Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1479–80 (9th Cir. 1986); *Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1397–98 (9th Cir. 1986)).

future fishing seasons. Following the Idaho fishing trip and remote conference from Fanelli's Idaho home, Porter received numerous communications from Reiss and Fanelli regarding the financial strength of Acute Angling. Reiss and Fanelli sent Porter such communications from May of 2021, until the closing of Porter's purchase of the Securities in December of 2021. Dkt. 1, ¶ 15. Porter provided examples of such emails and letters in his Complaint, and highlights that he lived in Idaho and was physically present in Idaho when he received all of Fannelli and Reiss's communications. *Id*.; Dkt. 23-1, ¶ 9. Such contacts ultimately induced Porter to purchase the Securities.[9] Where, as here, "the defendant directly solicits business in the forum state, the resulting transactions will probably constitute the deliberate transaction of business invoking the benefits of the forum state's laws." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 840 (9th Cir. 1986) (citing *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1331 (9th Cir. 1984)).

Third, conducting contract negotiations in the forum state can qualify as an invocation of the forum state's benefits and protections. *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1287 (9th Cir. 1977) ("by participating in contract negotiations in California, [defendant] purposefully availed itself of the privilege of

---

[9] Reiss and RTC make much of the fact that Porter also met with them in New Jersey. *See, e.g.*, Dkt. 19-1, at 3, 8; Dkt. 27, at 2, 7. Porter's sole trip to New Jersey does not undermine Reiss and RTC's solicitations in Idaho, contract negotiations in Idaho, or ongoing business relationship with an Idaho company. Further, Reiss was aware Porter was from Idaho months before the New Jersey trip, as he seemingly directed his agent to take Porter fishing in Idaho, held a remote conference with Porter from his agent's Idaho home, sent emails, financial statements, and letters to Porter in Idaho, and engaged in "extensive discussions around Porter buying a majority interest in [Acute Angling]" while Porter was in Idaho *before* the late 2021 New Jersey meeting. Porter also specifically told Reiss he was from Idaho, and coordinated his trip from Idaho to New Jersey with Reiss. Dkt. 23-1, ¶ 10. It is also undisputed that Reiss executed the Agreement with knowledge that he was contracting with an Idaho resident, and both Porter and Bradshaw's Idaho addresses are listed on the Agreement itself. Dkt. 1, Ex. A at 39. Given Reiss and RTC's extensive Idaho contacts, Porter's trip to New Jersey is immaterial.

carrying out activities in that state."). In late 2021, Porter hired Bradshaw, an Idaho attorney who lives in Idaho, to negotiate the purchase of the Securities on behalf of Porter Investments. To do so, Bradshaw engaged in extensive communications from Idaho, including by telephone and email, with Reiss and RTC's attorney. Further, as outlined above, Reiss and RTC also themselves "entered" Idaho by sending multiple communications to Porter and/or Bradshaw in Idaho during the course of contract negotiations. *Walden*, 571 U.S. at 285 (explaining "physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly relevant contact."); *Boschetto*, 539 F.3d at 1019 (recognizing that a defendant who never physically enters the state but employs technological "means for establishing regular business with a remote forum" may be subject to personal jurisdiction). Because Reiss, RTC, and Fanelli solicited Porter's investment in Idaho, the resulting contract negotiations in Idaho appear to constitute the transaction of business invoking the benefit of Idaho's laws. *Data Disc.*, 557 F.2d at 1288; *Decker Coal Co.*, 805 F.2d at 840; *Gates Learjet Corp.*, 743 F.2d at 1331 (finding defendant could have reasonably anticipated being "haled into court" in Arizona where, *inter alia*, defendant successfully negotiated a distributorship agreement in Arizona).

Fourth, to effectuate the Agreement, as well as to keep Acute Angling solvent and pay-off Acute Angling's pre-closing debts during the course of the parties' business relationship, Reiss and RTC received multiple wire payments from Porter's Idaho bank account. Dkt. 1, ¶¶ 24–25;  Dkt. 1, Ex. A § 1.2; Dkt. 23-1, ¶ 14. Although receiving payments from an Idaho account is not alone sufficient to constitute purposeful availment,

it does constitute a relevant forum contact, particularly when considered together with the additional Idaho contacts outlined herein. *See, e.g., Global Commodities Trading Grp., Inc.*, 972 F.3d at 1108 (concluding plaintiff established defendant had minimum contacts with California where, among other things, defendant "consistently made payments on the contracts to [plaintiff] in California.").

Fifth, Porter executed all of the transaction documents while in Idaho (Dkt. 23-1, ¶ 12) and the various contracts between the parties include Porter's Idaho address. Dkt. 1, Ex. A at 39; Dkt. 23-1, Ex. C-28. "Claims arising out of the alleged breach of those contracts therefore arise out of forum-based activities." *Silk*, 65 F.4th at 457; *Data Disc*, 557 F.2d at 1288 (finding defendant purposefully availed itself of California where contract was at least partially negotiated in California and actually formed in California upon the execution of plaintiff's acceptance); *Hirsch*, 800 F.2d at 1480 n. 3 (explaining that while signing a contract in the forum state is not alone sufficient to establish specific jurisdiction, this fact is relevant to the jurisdictional inquiry).

Sixth, "parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473. On or about December 10, 2021, Porter and Reiss executed the Agreement,[10] effectuating Porter

---

[10] Reiss and RTC highlight the "governing law" provision in the Agreement provides that any action arising out of the Agreement should be instituted "in the Federal Courts of the United States of America or the Courts of the State of Delaware." Dkt. 19-1, at 4 (citing Dkt. 1, Ex. A at § 7.10). As such, Reiss and RTC suggest "[n]othing in the Agreement subjects Reiss and RTC to the jurisdiction of the courts in Idaho." Dkt. 19-1, at 4. While this may be true, the forum selection clause expressly authorizes bringing suit in *any* federal district court, which obviously includes the District of Idaho. *Id*. Moreover, as explained above, Reiss and RTC solicited Porter's investment in Idaho, engaged in contract negotiations in Idaho, and,

Investments' purchase of 60% of the membership interest in Acute Angling, with RTC retaining the remaining 40% interest. *Id*. Rather than a fleeting business arrangement or one-time purchase, the parties created an indefinite business relationship with long-term bilateral obligations. For instance, from closing until March 1, 2023, Reiss remained in control of Acute Angling's business operations, serving as its president, while Porter Investments acted as Acute Angling's manager. Dkt. 1, ¶ 29; Dkt. 23-1, ¶ 13. RTC also made extensive representations and warranties to Porter Investments under the Agreement. For example, RTC agreed to defend Porter Investments against third-party suits, knowing it was entirely possible it would have to defend litigation in Idaho, given that Porter Investments is an Idaho LLC located in Idaho. Dkt. 1, Ex. A at § 6. Under the Operating Agreement, Reiss also agreed to multiple long-term obligations to Porter Investments, including: (1) granting a right of first refusal applicable to a sale of his equity; (2) agreeing not to transfer his equity; (3) granting drag-along rights; (4) submitting to a five-year non-competition clause; and (5) submitting to a five-year non-solicitation agreement. Dkt. 1, Ex. C at §§ 8.01, 8.03, 8.04, 12.03–12.05.

Seventh, and finally, during the parties' business relationship, Brent Moreland, a non-party, later purchased a 10% interest in Acute Angling from RTC. Dkt. 1, ¶ 28. Effective March 15, 2022, Acute Angling, RTC, Porter Investments, and a company owned by Moreland entered into a new operating agreement entitled Second Amended & Restated

---

among other relevant forum contacts, entered into a long-term business relationship with an Idaho company. The Agreement's choice of law provision is accordingly immaterial. *Haisten*, 784 F.2d at 1400 ("While [a choice-of-law] provision should not be ignored in determining purposeful availment, it alone will not suffice to block jurisdiction in the [forum state] where other facts indicate that the [defendant] has purposefully directed its activities toward [forum residents].").

Limited Liability Company Agreement ("Amended Operating Agreement"). *Id*. Thus, rather than an isolated or fleeting contract, Reiss and RTC entered into a series of contracts—including the initial NDA, the Agreement, first Operating Agreement, and Amended Operating Agreement—resulting in an ongoing business partnership with Porter Investments, an Idaho company, as well as a subsequent partnership with Porter Investments and a new investor. It was accordingly foreseeable that Porter Investments would suffer the consequences of Reiss and RTC's alleged breach in Idaho. *Burger King*, 471 U.S. at 480 ("[P]arties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities.") (cleaned up).

Taking each of the aforementioned forum contacts in conjunction, the Court finds Reiss and RTC reached out beyond New Jersey to "create continuing relationships and obligations with citizens of [Idaho]." *Global Commodities Trading Grp., Inc.*, 972 F.3d at 1108 (cleaned up). Reiss and RTC solicited Porter's business in Idaho both physically, and over seven months of communications between Idaho and New Jersey. As a result of such Idaho contacts, Reiss and RTC entered into a series of contracts with Porter Investments, and ultimately had a partnership with Porter Investments for over a year. During the relationship, Porter also funneled hundreds of thousands of dollars from his Idaho bank account to New Jersey to sustain Acute Angling and fulfill its various liabilities. Reiss and RTC thus obtained numerous benefits from an Idaho company.[11] In sum, Porter

---

[11] In addition to keeping Acute Angling operational, Porter's various cash infusions allowed Reiss to: (1) forgive debt owed to Acute Angling by its two Brazilian contractors; (2) pay off approximately $131,000.00

Investments has made a prima facie showing that Reiss and RTC purposefully availed themselves of an Idaho forum. *Id.*

b. Purposeful Direction

In assessing purposeful direction, the Ninth Circuit applies the "effects" test set forth by the Supreme Court in *Calder v. Jones*, 465 U.S. 783, 789–90 (1984). *Yahoo!*, 433 F.3d at 1206. The effects test is satisfied if the defendant: "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017) (cleaned up). If these elements are met, a court can exercise jurisdiction "even if the defendant never set foot in the forum state." *Burri Law PA v. Skurla*, 35 F.4th 1207, 1213 (2022).

Rather than assessing the defendant's contacts with the plaintiff, the effects test is satisfied when "intentional conduct by the defendant . . . creates the necessary contacts with the forum." *Walden*, 571 U.S. at 286. A plaintiff's connection with the forum—or defendant's knowledge of such connection—is insufficient to establish purposeful direction. *Id.* at 289. The United States Supreme Court's decision in *Walden* illustrates this principal. Plaintiffs in *Walden* alleged that an Atlanta-based Drug Enforcement Administration agent violated their Fourth Amendment rights by seizing almost $97,000.00 in cash from their carry-on bags while they waited in a Georgia airport for a

---

in credit card debt for pre-closing business expenses; (3) pay monetary penalties imposed by the Brazilian government for Acute Angling's pre-closing operations; and (4) pay legal fees in Brazil for Acute Angling's pre-closing unpermitted fishing trips in indigenous areas. Dkt. 1, ¶¶ 41–47.

connecting flight to Nevada. *Id*. at 280. Although Plaintiffs filed suit in Nevada, where they resided, the Supreme Court held the agent had insufficient contacts with Nevada to establish personal jurisdiction. In so holding, the Supreme Court emphasized that all of the allegedly wrongful conduct occurred in Georgia, and that the agent "never traveled to, conducted activities within, contacted anyone in, or ever sent anything or anyone to Nevada." *Id*. at 289. As such, "when viewed through the proper lens—whether the *defendant's* actions connect him to the *forum*—[defendant] formed no jurisdictionally relevant contacts with Nevada." *Id*. (emphasis in original).

Unlike the agent in *Walden*, Reiss and RTC committed intentional acts both expressly aimed at Idaho, and causing foreseeable harm in Idaho.

### i. Intentional Act

The Ninth Circuit construes "intent" in the context of the "intentional act" requirement of *Calder's* effects test "as referring to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *Schwarzenegger*, 374 F.3d at 806. Reiss and RTC committed intentional acts by repeatedly allegedly misrepresenting that Acute Angling was solvent and profitable, including through their agent during the Idaho fishing trip, via the Idaho remote conference with Porter, in subsequent communications sent to Idaho, and in negotiations with Porter and Bradshaw from Idaho. For purposes of the intentional act requirement, it is not necessary for Porter Investments to show that Reiss and RTC intended to mislead or to otherwise commit an intentional tort. The intentional act requirement is satisfied because Reiss and RTC intentionally represented that Acute Angling was profitable and solvent.

*Calder*, 465 U.S. at 789 (explaining writing and publishing allegedly libelous article constituted intentional acts); *Marlyn Nutraceuticals, Inc. v. Improvita Health Prods.*, 663 F. Supp. 2d 841, 850 (D. Ariz. 2009) ("The phone calls, emails and mailings sent by the Defendants and the misrepresentations therein constitute intentional acts for the purposes of the effects test.).

### ii.    *Express Aiming*

Porter Investments must next show Reiss and RTC expressly aimed their intentional acts—the representations regarding Acute Angling—at Idaho. Such alleged misrepresentations first occurred when Reiss and RTC's agent personally met with Porter in Idaho, and again the next day when Reiss and RTC met with Porter via remote conference. After the Idaho meetings with Porter, Reiss and Fanelli sent many solicitous communications to Idaho, and Reiss and his attorney ultimately conducted contract negotiations with Porter and his attorney while the latter two were in Idaho. Where, as here, misrepresentations are made in the forum state—in person, through an agent, or electronically—the express aiming requirement is met. *Walden*, 571 U.S. at 287 (explaining the express aiming analysis considers the various contacts the defendants created with the forum, and not just with the plaintiff, such as making phone calls to the forum and circulating false statements in the forum); *Burri Law*, 35 F.4th at 1214 (finding defamatory statements in phone calls and written correspondence sent to Arizona were expressly aimed at Arizona); *Data Disc.*, 557 F.2d at 1288 ("The inducement of reliance in California is a sufficient act within California to satisfy the requirement of minimum contacts where the cause of action arises out of that inducement.").

### iii.       Foreseeable Harm

Finally, unlike the defendant in *Walden*—whose *only* link to the forum was the fact

that the plaintiffs resided there—Reiss and RTC caused harm they knew was likely to be

suffered in Idaho. Reiss and RTC learned Porter was an Idaho resident before they first

solicited his investment, as Porter informed the listing agent from BizBuySale that he lived

in Boise. Thereafter, Reiss, Fanelli, and RTC met with Porter in Idaho and sent numerous

communications to Porter in Idaho—both when soliciting his investment and while

negotiating the Agreement—containing alleged misrepresentations regarding Acute

Angling's profitability. To further induce Porter Investments' purchase of the Securities,

Reiss also helped facilitate Porter's travel from Idaho to New Jersey by arranging the

meeting with Roth and driving Porter to Gary Reiss's home. Dkt. 23-1, ¶ 10.

After the sale of Securities closed, Reiss and RTC operated Acute Angling with

Porter Investments—an Idaho LLC with an Idaho resident as its sole member—for over a

year. Reiss served as the president of Acute Angling, and Reiss and RTC received wire

payments from Porter's Idaho bank account, throughout this period. Dkt. 23-1, ¶¶ 12, 14.

And, again unlike *Walden*—where the plaintiff's lack of access to the seized cash could

have occurred in any forum—the financial loss here was suffered by Porter Investments in

Idaho. *Walden*, 571 U.S. at 289; *Id*. at ¶¶ 14–15.

In short, Idaho was the focal point of both Reiss and RTC's alleged

misrepresentations and of the harm Porter Investments suffered. Thus, Reiss and RTC's

alleged tortious conduct was directed at Idaho itself, and not just at an Idaho resident.

*Walden*, 571 U.S. at 289.

c.  <u>Conclusion</u>

The Court finds Reiss and RTC both purposefully availed themselves of the privilege of doing business in Idaho, and purposefully directed tortious activities at Idaho.[12] With the first prong of the specific jurisdiction test met, the Court turns to the second.

2.  *Relatedness*

The second prong of the personal jurisdiction analysis considers whether the plaintiff's claims arise out of, or relate to, the defendant's forum-related activities. *Schwarzenegger*, 374 F.3d at 802. A "single forum state contact can support jurisdiction if the cause of action arises out of that particular purposeful contact of the defendant with the forum state." *Yahoo!*, 433 F.3d at 1206.

To assess relatedness, the Court considers if Porter Investments' claims would have arisen "but for" Reiss and RTC's contacts with Idaho. *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995). But for Reiss and RTC's solicitations and contract negotiations in Idaho, Porter Investments would not have purchased the Securities, and would not have allegedly suffered $1,526,500.00 in damages as a result. Thus, Porter Investments' contract and tort claims arise from Reiss and RTC's purposeful efforts to solicit business in, and contract with a resident of, Idaho. The relatedness prong is accordingly satisfied. *See, e.g., Silk*, 65 F.4th at 457 ("When Silk performed financial services for Bond he did so from California, and the relevant contracts list Silk's California business address. Claims arising

---

[12] Even if Reiss and RTC did not purposefully avail themselves of an Idaho forum, the Court exercises pendant personal jurisdiction over Porter Investments' contract claims against Reiss and RTC because such claims "arise out of the same 'common nucleus of operative facts'" as the tort claims over which specific personal jurisdiction has been established. *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quoting *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004)).

out of the alleged breach of those contracts therefore arise out of forum-based activities."); *Panavision Int'l. L.P. v. Toeppen*, 141 F.3d 1316, 1322(9th Cir. 1998) (finding relatedness prong satisfied where, but for defendant's tortious "conduct directed toward [plaintiff] in California," plaintiff would not have been injured in California).

### 3. Reasonableness

Because Porter Investments has satisfied the first two prongs of the specific jurisdiction test, the Court presumes the exercise of personal jurisdiction is reasonable, and the burden of establishing otherwise shifts to Reiss and RTC. *Boschetto*, 539 F.3d at 1016. To assess reasonableness, the Ninth Circuit evaluates the following factors: (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. *Ziegler v. Indian River Cnty.*, 64 F.3d 470, 475 (9th Cir. 1995).

In their Motion to Dismiss, Reiss and RTC address only three of the aforementioned factors: (1) the burden on the defendant; (2) the plaintiff's interest in obtaining relief in the forum; and (3) the forum state's interest in adjudicating the dispute. Dkt. 19-1, at 8 (citing *Asahi Metal Indus.*, 480 U.S. at 113). Given Reiss and RTC's "heavy burden" of establishing the exercise of jurisdiction is unreasonable, the four factors Reiss and RTC ignore either weigh in favor of exercising jurisdiction or, at most, are neutral. *Dole Food Co. v. Watts*, 303 F.3d 1104, 1117 (9th Cir. 2002) (emphasizing the strong presumption in

favor of reasonableness and weighing factors in plaintiff's favor where such factors did not clearly favor defendant); *Rohrback Cosasco Sys., Inc. v. Sensor Networks, Inc*., 2023 WL 9511163, at *6 (C.D. Cal. Dec. 17, 2023) (weighing reasonableness factors defendants failed to address in favor of the plaintiff).

With respect to the burden on the defendant, Reiss and RTC argue that, as New Jersey residents, they would "face an extraordinary burden to defend [an] action across the country, in Idaho. Neither Reiss nor RTC reside in Idaho, nor do they maintain any offices, records, or employees in the State."[13] Dkt. 19-1, at 8. Reiss and RTC's burden of litigating in Idaho is equivalent to the burden Porter Investments faces if forced to litigate in New Jersey. Porter Investments neither resides in New Jersey, nor maintains any offices, records, or employees in New Jersey. Although the parties' burdens are equal, this factor weighs in favor of Reiss and RTC because the law of personal jurisdiction is "primarily concerned with the defendant's burden." *Ziegler*, 64 F.3d at 475 (cleaned up). However, because "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity," it "usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." *Burger King*, 471 U.S. at 474. Moreover, Reiss and RTC have not presented *any* specific information to establish the severity of their burden. Thus,

---

[13] Reiss and RTC also emphasize that due to their presence on the East Coast, "the parties acknowledged in the Agreement that the *only* state that could have jurisdiction over the parties' dispute is Delaware, as Delaware is the state where Acute Angling, LLC is registered." Dkt. 19-1, at 8–9 (emphasis in original). However, the forum selection clause Reiss and RTC cite also specifically authorizes suits "instituted in the federal courts of the United States of America," with "each party irrevocably submit[ting] to the exclusive jurisdiction of such courts." Dkt. 1, Ex. A at § 7.10. As such, that the parties agreed to a specific state forum is irrelevant to this federal proceeding.

the Court concludes this factor weighs only slightly in Reiss and RTC's favor. *Ballard*, 65 F.3d at 1501 (explaining that unless a defendant's burden of litigating in the forum "is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction") (cleaned up).

With respect to Porter Investments' interest in obtaining relief in Idaho, Reiss and RTC broadly assert "*no facts* compel this case to be litigated in Idaho, other than Plaintiff's state of incorporation." Dkt. 19-1, at 9. This contention ignores, among other jurisdictional contacts, that Reiss and RTC met physically through their agent and virtually via remote conference with Porter in Idaho, solicited Porter's business in Idaho, engaged in contract negotiations in Idaho, entered into a series of contract and an ongoing business relationship with an Idaho company, repeatedly accepted wire payments from an Idaho bank account, and injured Porter Investments in Idaho. Such extensive forum contacts underscore Porter Investments' interest in obtaining relief in Idaho, as does Porter Investments' claim for securities fraud under the Idaho Uniform Securities Act. Although the plaintiff's interest "is not of paramount importance" when assessing reasonableness, Porter Investments' interest in pursuing a claim for violation of an Idaho statute weighs in its favor. *Menken*, 503 F.3d at 1061.

Finally, Reiss and RTC appear to suggest Idaho does not have an interest in adjudicating this dispute because "there can be no question that forcing Reiss and RTC— New Jersey residents that never subjected themselves to the State of Idaho—is inconsistent with the bounds of 'fair play and substantial justice.'" Dkt. 19-1, at 9. As detailed herein, Porter Investments has shown that Reiss and RTC both purposefully availed themselves of

the privilege of doing business in Idaho, and purposefully directed tortious conduct at Idaho. Porter Investments has also shown that its claims arise out of Reiss and RTC's forum related conduct. Because Porter Investments has satisfied the first two prongs of the specific jurisdiction test, and in light of Reiss and RTC's failure to substantively address Idaho's interest in adjudicating this dispute, the Court finds the exercise of jurisdiction comports with fair play and substantial justice. *Schwarzenegger*, 374 F.3d at 802. Moreover, Idaho "has a strong interest in protecting its residents from torts that cause injury within the state, and in providing a forum for relief." *Brainerd v. Governors of the Univ. of Alberta*, 873 F.2d 1257, 1260 (9th Cir. 1989); *Ballard*, 65 F.3d at 1501 (explaining states have an interest in protecting their citizens from the fraudulent activity of out-of-state actors). Idaho's interest in adjudicating this suit thus weighs in Porter Investments' favor.

Of the three reasonableness factors they address, one weighs slightly in favor of Reiss and RTC, and the other two weigh in favor of Porter Investments. Given this, and because Reiss and RTC ignore the remaining four reasonableness factors, the Court finds Reiss and RTC fall far short of presenting a compelling case that the exercise of jurisdiction in Idaho would be unreasonable. *Panavision Int'l*,141 F.3d at 1324 ("[W]e conclude that although some factors weigh in [defendant's] favor, he failed to present a compelling case that the district court's exercise of jurisdiction in California would be unreasonable."); *Roth v. Garcia Marquez*, 942 F.2d 617, 625 (9th Cir. 1991) (finding the exercise of jurisdiction was reasonable even where the majority of the reasonableness factors favored the defendant); *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 129 (9th Cir. 1995) ("[G]iven the closeness of the factors, we conclude that [defendant] has not presented a

'compelling case' that exercising jurisdiction would be unreasonable.").

### 4.  Conclusion

Porter Investments has made a prima facie showing on the first two prongs of the specific jurisdiction test, and Reiss and RTC have not carried their burden of rebutting the third. As all three prongs of the specific jurisdiction test are met, this Court has personal jurisdiction over Porter Investments' claims against Reiss and RTC. Reiss and RTC's Motion to Dismiss (Dkt. 19) is accordingly DENIED.

## B.  Roth and RRBB's Motion to Dismiss (Dkt. 20)

The Court's jurisdictional analysis with respect to Roth and RRBB (hereinafter "Roth/RRBB") is considerably narrower than that provided above given: (1) Roth/RRBB's lack of forum contacts; and (2) the parties' agreement that "the Purposeful Direction test is most applicable to the present case." Dkt. 23, at 13; Dkt. 28, at 2. The Court accordingly considers solely purposeful direction with respect to Roth/RRBB.

### 1.  Forum Contacts

Porter Investments' negligent misrepresentation claim against Roth/RRBB appears to be based entirely on statements Roth/RRBB made during the parties' in-person meeting in New Jersey. Dkt. 1, ¶¶ 80–85. Specifically, when Porter met Roth/RRBB at Gary Reiss's New Jersey home, Roth/RRBB allegedly misrepresented that Acute Angling was profitable and solvent. *Id*. at ¶ 15.h. Apart from such statements during the New Jersey meeting, Porter Investments does not identify any other specific misconduct by Roth/RRBB.[14] *See*

---

[14] While Porter Investments alleges Roth/RRBB made material misrepresentations "directly to Porter, *including* in an in-person meeting in New Jersey," the Complaint does not identify a single additional

*generally* Dkt. 1. In the absence of allegations that Roth/RRBB sent communications to Idaho, travelled to Idaho, conducted contract negotiations in Idaho, or *in any way* interacted with Porter Investments in Idaho, the sole connection between Roth/RRBB and Idaho is the fact that Roth/RRBB spoke to an Idaho resident during a meeting in New Jersey.

### 2. Purposeful Direction

That Roth/RRBB made alleged misrepresentations to an Idaho resident on one occasion—outside of Idaho—does not establish purposeful direction. Notably, during the New Jersey meeting between Porter and Roth/RRBB, it is unclear if Roth/RRBB was even aware that Porter lived in Idaho. None of the parties—including Porter—suggest Roth/RRBB knew Porter was from Idaho. Instead, Porter explains:

> I had to coordinate my visit with Paul Reiss and Garry Reiss because they wanted to ensure that Roth was in town when I came to visit. To reach the meeting, I had taken a cab to Paul Reiss's home from the airport and Paul Reiss drove me to Garry Reiss's house for the meeting. Roth was aware that [Paul] Reiss drove me to this meeting.

Dkt. 23-1, ¶ 10. Clearly, that Roth/RRBB's were aware Reiss drove Porter to the New Jersey meeting does not mean Roth/RRBB knew Porter was from Idaho.

Regardless, even if Roth/RRBB did know Porter was an Idaho resident, the specific jurisdiction analysis "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285 (citing *Int'l Shoe*, 326 U.S. at 319). Significantly, Porter Investments does not identify any contact Roth/RRBB made with Idaho. Like the agent in *Walden*, Roth/RRBB never traveled to,

---

meeting or communication—whether by letter, phone, email, or in person—between Roth/RRBB and Porter. Dkt. 1, ¶ 82 (emphasis added).

made statements in, sent communications to, interacted with Porter Investments within, received payments from, or sent anyone or anything to Idaho. *Id*. at 289.  Thus, even if Roth/RRBB knew Porter was from Idaho, Porter Investments fails to delineate any connection between Roth/RRBB and Idaho itself. Without any forum contacts, Roth/RRBB cannot be found to have either expressly aimed alleged misrepresentations at Idaho, or to have caused foreseeable harm in Idaho. *Id*. at 289–90.

Due Process "requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* at 286 (quoting *Burger King*, 471 U.S. at 475). A "defendant's relationship with a plaintiff or third-party, standing alone, is an insufficient basis for jurisdiction." *Walden*, 571 U.S. at 287. Consequently, Roth/RRBB's alleged misrepresentations during the New Jersey meeting were not expressly aimed at Idaho simply because Porter is an Idaho resident. *Id*. at 289. To hold otherwise would improperly attribute Porter's forum connections to Roth/RRBB. *Id*. In addition, "mere injury to a forum resident is not a sufficient connection to the forum." *Id*. at 290. Because Roth/RRBB's conduct was not connected to Idaho in any meaningful way, the fact Porter Investments suffered harm in Idaho is not jurisdictionally relevant. *Id*. Roth/RRBB's relevant conduct occurred entirely in New Jersey, and the mere fact that such conduct affected an Idaho resident does not suffice to authorize jurisdiction. *Id*. at 291.

In the absence of any contacts with Idaho, Roth/RRBB's connection with Porter Investments is insufficient to establish purposeful direction. *Kulko v. Superior Court of*

*Cal., City and Cnty. of San Francisco*, 436 U.S. 84, 93 (1978) (declining to find personal jurisdiction in a State merely because the plaintiff resided there); *Burger King*, 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.") (emphasis in original).

### 3. *Conclusion*

Because Porter Investments fails to satisfy the first prong of the specific jurisdiction test, the Court lacks personal jurisdiction over Roth/RRBB. *Schwarzenegger*, 374 F.3d at 802 ("If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state."). Roth/RRBB's Motion to Dismiss (Dkt. 20) is accordingly GRANTED.

## V. CONCLUSION

Reiss and RTC both purposefully availed themselves of the privilege of conducting business in Idaho and purposefully directed activities at Idaho. Porter Investments' claims against Reiss and RTC arise out of such forum-related activities and the exercise of jurisdiction in Idaho is reasonable. Accordingly, the Court has specific personal jurisdiction over Reiss and RTC. By contrast, Roth/RRBB did not have any contacts with Idaho, and did not purposefully direct any activities at Idaho. The Court thus lacks specific personal jurisdiction over Roth/RRBB.

## VI. ORDER

Now, therefore, it is **HEREBY ORDERED**:

1. Reiss and RTC's Motion to Dismiss (Dkt. 19) is **DENIED**;

2.  Roth/RRBB's Motion to Dismiss (Dkt. 20) is **GRANTED**;

3.  Roth/RRBB are hereby **DISMISSED from this action**;

4.  On or before October 11, 2024, the remaining parties shall submit Joint Litigation and Discovery Plans. The Court will enter a Scheduling Order upon receipt of the parties' joint plans.

DATED: September 13, 2024

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 30